284 So.2d 734

**William SIMPSON**

v.

**STATE.**

**3 Div. 207.**

Court of Criminal Appeals of Alabama.

Sept. 28, 1973.

Rehearing Denied Oct. 30, 1973.

Howard C. Oliver, Montgomery, for appellant.

William J. Baxley, Atty. Gen., and Daniel B. Banks, Jr., Sp. Asst. Atty. Gen., for the State.

CATES, Presiding Judge.

First degree murder: life imprisonment.

## I

December 12, 1971, the body of Father Michael Caswell was found in some woods near Our Lady of Fatima School in eastern Montgomery County. Father Caswell was in charge of the school which apparently boarded problem boys. His death was caused by strangulation. His body had abrasions, bruises and lacerations, as though it had been dragged. A green cord was around Father Caswell's neck.

A tractor, belonging to the school, was examined and blood was found on the bushhog attached to the tractor.

Though not raised as an issue by either party, it is imperative to consider whether appellant's jacket was introduced into evidence. If it were not introduced, the decision of the legality vel non of the seizure of the jacket would be unnecessary.

█  At trial the jacket was marked for identification, displayed to the Jury and commented upon by witnesses. But it was technically not "introduced" as evidence.

As stated in Freeman v. State, 46 Ala. App. 640, 247 So.2d 682:

"Articles of personal property may be considered evidence after being exhibited before the jury and commented upon although they may not have been previously marked for identification or formally introduced into evidence."

See Rainey v. State, 48 Ala.App. 530, 266 So.2d 335 and Gamble v. State, 48 Ala. App. 605, 266 So.2d 817.

We conclude that the appellant's jacket was before the Jury and was considered as evidence in this case.

The principal State witness was Herman Pitts, a Department of Public Safety investigator. He went through the school accompanied by Calvin Keith. Keith, it is inferable, was second in charge of the school, he being the cook and a teacher.

While going through a dormitory corridor the two came to a room occupied by appellant and one Worsham. There was no door to the room. On Simpson's bed was a jacket.

Pitts testified without objection as follows:

"Q  I show you State Exhibit No. 3. Sergeant, can you identify that?

"A  Yes, sir.

"Q  Did you deliver that to James Small, the State Toxicologist?

"A  Yes, sir. I did.

"Q  Will you tell how you came into possession of it?

"A  I found this jacket in the room of William Simpson on his bed.

"Q  All right. When did you find it? What date?

"A  On December 12th, Sunday, shortly after Noon.

"Q  Are you familiar with those type jackets?

"A  Yes, sir. I am.

"Q Will you show the Jury a place on there where the string should be?

"A This is what I have been told is an Army field jacket and it is the same type jacket I have worn when I was in Service which carries a string inside of the jacket going into here and coming out over on this side that takes up the slack around inside of the jacket to make it fit better."

Keith had testified on cross examination in part as follows:

"Q You say Sgt. Pitts got this jacket. Is that right, Calvin?

"A Yes.

"Q Where did he get it?

"A It was in Simpson's bed.

"Q In Simpson's room?

"A Yes.

"Q Did Sgt. Pitts have your permission before entering the room?

"A He asked permission would I take him and show him the house and let him talk to the boys about the surgical sheet that was on Father.

"Q Did he ask you for permission to enter Simpson's room?

"A He asked me, 'Is this Simpson's room?' and I said, 'Yes,' and he said, 'Can I look around in here,' and I said 'Yes.'

"Q Did you ask Simpson or Worsham for their permission to go in the room?

"A No. He—I didn't have to."

And we quote further from Keith's testimony:

"Q Calvin, when Sgt. Pitts asked you if he could look around, were you the person in charge there at the school temporarily at that time?

"A Yes.

"Q Were you the person in charge and gave permission of who came and who went at that particular time?

"MR BRANCH: I object to the leading.

"THE COURT: Overruled.

"THE WITNESS: I knew it was my duty whenever Father left there that I was in full charge.

"BY MR. JULE H. HERBERT: (Continuing)

"Q You were in full charge?

"A Yes.

"Q That room that William Simpson and Gerald Worsham lived in, how many beds were in there?

"A At that time there were three beds.

"Q Did that mean that there were three people occupying the room?

"A No.

"Q It didn't. Was one of the beds normally empty?

"A Yes.

"Q I will ask you this. Is there any door on that room?

"A No, sir.

"Q It was just a door facing, you mean?

"A That's right.

"Q Could Sgt. Pitts have stood in the hall and seen this jacket you described on Simpson's bed? Could he?

"A Yes, he could have.

"Q Did you see it from there?

"A Yes, I could have.

"Q You saw it from the hallway.

"A I didn't pay any attention, though.

"Q But you could have seen it if you had been looking at it?

"A Yes.

"MR. HERBERT: That's all.

"RECROSS-EXAMINATION:

"BY MR. C. LANIER BRANCH:

"Q Calvin, let me ask you this. Where on the bed was this jacket?

"A It was either—I couldn't tell where the—sometimes they will just turn the sheets and the spread back when they get up and—I believe it was under both sheets, under the sheets and the spread—I don't know, but it was lying near the head of the bed.

"Q Was it under the covers?

"A You could see most all of it sticking out.

"Q The collar doesn't have a cord or anything like that in it, does it?

"A The cord—no, not in the collar.

"Q So, you are saying you could look in there but all you could see was just a piece of clothing under some covers on the bed.

"A You couldn't identify it whether it was a field jacket or not. It was that much distance.

"Q Did Father Michael give you any written authority as to what you could and could not do?

"MR. HERBERT: I object. It was the custom for years there and he said he was in charge.

"MR. BRANCH: That doesn't have anything to do with whether he gave him any written authority—

"THE COURT: Overruled.

"THE WITNESS: Not written. He said it, though.

"BY MR. C. LANIER BRANCH: (Continuing)

"Q Well, what did he say to you? Did he say to look in all the boys' rooms whenever you want to?

"A I could do that without his permission—normally, I did the laundry and when I would I would go and strip the rooms and all.

"Q You weren't doing the laundry this day, were you?

"A No, I wasn't doing it that day but I had been doing it and he gave me authority to go in and out of the rooms.

"Q Because he had given you the authority to do the laundry?

"A Well, not authority. Permission."

\* \* \* \* \* \*

"Q What is the salary that you are paid at the school, Calvin?

"A None.

"Q You stay there for free. Is that right?

"A Yes.

"Q You are given room and board but you receive no compensation for staying there?

"A I did, but—"

Later defense counsel (R. 195) objected to "the coat on the basis \* \* \* that the proper showing of the Sergeant had any authority to enter the room to seize this, he did not have a warrant \* \* \*." This motion was overruled.

II

The appellant had raised the issue of the seizure of his Army field jacket from his

room in the dormitory at Our Lady of Fatima School. The thrust of appellant's argument is that the seizure was violative of the Fourth Amendment prohibition against unreasonable searches or seizures.

Appellant contends that the seizure of the jacket led to his giving a confession. This statement made Simpson out to be an accomplice in Worsham's mugging the priest. Later, when returning from having diverted an intruder, Simpson saw Worsham apply the cord around Father Caswell's neck and twist it until the latter slumped.

According to this confession, Worsham told Simpson to get rid of the body. This appellant sought to do—by taking it on a bushhog attached to a tractor. Once, during the grim nocturnal trip into the woods, Caswell's corpse fell off. Finally, Simpson wrapped it in a surgical sheet and left it, taking the tractor and bushhog back up to the curtilage of the school.

Witnesses testified as to hearing the tractor that night.

### III

We have carefully reviewed the evidence relating to the taking of the confession. The most serious obstacle for the State was the fact that the appellant was interrogated to some extent from 2:30 in the afternoon until 1:30 in the morning.

On this, the State's brief relates as follows:

"* * * The appellant was arrested at approximately 2:30 in the afternoon (R 162) and was taken downtown where he and Gerald Worsham were advised of their rights (R 150) and they signed waiver of rights forms (R 157). At this time, both the appellant and Gerald Worsham denied any knowledge of the crime (R 179) and they were than taken back to the school. The police officers resumed questioning of others and about 10:30 P.M. the appellant asked to see Sgt. Pitts (R 180) voluntarily and on his own. Sgt. Pitts again advised him of his rights (R 180–181) and appellant then made the statements of his involvement in the murder (R 180–184). The statement was then reduced to writing and was signed by the appellant at approximately 1:30 A.M. There was clearly no continuous questioning of the appellant from 2:30 P.M. until 1:30 A.M. as appellant would have you believe."

■ We have concluded that the State adduced sufficient evidence to support the trial judge's finding that as a matter of law the confession was voluntary.

Both *Miranda* and Pre-*Miranda* predicates were established.

### IV

■ As to the taking of the jacket, we would point out that Keith clearly had authority to let Pitts go through the common areas of the school such as the corridor which led to Simpson's room.

At the threshold, we distinguish Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856. There an eager to please night clerk admitted two police officers to Stoner's locked hotel room. It was a warrantless search.

The court, in *Stoner*, was unanimous in branding the search as violative of the Fourteenth Amendment via the Fourth. Mr. Justice Harlan alone voted against forthwith applying the rule of exclusion. He would have remanded for a further hearing as to harmless error vel non.

A dormitory can be different from a hotel room. In Piazzola v. Watkins, 442 F. 2d 284, Troy State University had a parietal rule reserving a right to enter rooms

for inspection purposes. The Fifth Circuit held that the regulation was an unconstitutional attempt to require a student to waive his protection from unreasonable searches and seizures as a condition to his occupancy.

 In Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, the plain view doctrine is extensively developed in the opinion of Mr. Justice Stewart. Exigent circumstance must obtain to excuse a warrantless search: this even though probable cause existed. Plain view is ordinarily antithetic to trespassory intrusion. Jenkins v. State, 46 Ala.App. 719, 248 So.2d 758.

Here we have a dormitory room which by design had no door—presumably to permit scrutiny of the occupants and contents. We distinguish *Piazzola*, supra.

Next, Pitts standing in the hallway was no trespasser. Fullbright v. United States, 10 Cir., 392 F.2d 432 (officer with binoculars); Anno. 48 A.L.R.3d 1178. Nor was he in a position to get a search warrant from the county seat some twenty miles distant. He, under the evidence, had no accompanying officer who could have stood guard in the hall while he went to a magistrate.

If we apply the concept of an area within the expectation of privacy mentioned in Katz v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576, we reach the same result.

Hence, we conclude that the seizure of the jacket from Simpson's room did not require the exclusion of that garment from being admitted in evidence.

We have reviewed the entire record under Code 1940, T. 15, § 389 and consider that the judgment below is due to be

Affirmed.

All the Judges concur.