Appellant was indicted and convicted under § 13A-5-40 (a)(2), Code of Alabama 1975, for murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant. After a separate hearing on aggravating and mitigating circumstances, the jury fixed appellant's punishment at life imprisonment without parole. Subsequently the trial judge weighed the aggravating and *Page 368 
mitigating circumstances pursuant to § 13A-5-47, Code of Alabama 1975, and finding no mitigating circumstances, rejected the jury's advisory verdict and fixed appellant's punishment at death. The court entered specific findings of fact which set forth the aggravating circumstances which the court found sufficient to indicate that death was the appropriate punishment.
Because this is a conviction of a capital offense resulting in a sentence of death, we will detail the crucial facts presented at trial.
Mr. Robert D. Mitchell testified that in September of 1981, he lived in a mobile home next door to The Outdoorsman store. His trailer was located approximately forty-five yards north of the store. The residence of Mr. Bobby Thompson was situated on the same side of the road, about eighty yards north of Mr. Mitchell's mobile home. Both his trailer and The Outdoorsman faced Highway 225, with the front of Mr. Mitchell's trailer sitting approximately one hundred feet closer to the highway than the front of the store. There are no woods between his trailer and The Outdoorsman.
Mr. Mitchell testified he was at his trailer preparing for bed around 8:30 p.m. on September 14, 1981, when he heard five gunshots. At that moment he was in his bedroom on the south end of his trailer. He was able to look directly out that window and see The Outdoorsman store, where he saw a man crouched down by the north side of the store. He watched as the man ran out front into the light, returned and crouched down again, and then moved slowly toward the end of the building and ran south.
The man Mr. Mitchell observed wore a white tee-shirt and dark pants. He was a black male, approximately five feet six inches in height and 140 pounds in weight.
As the man came out into the light the second time, he was carrying a brown paper sack in his left hand. In his right hand he held a plastic garbage bag. Mr. Mitchell grabbed his gun and drove to the store, arriving just after Mr. Bobby Thompson. When he arrived, he saw the victim, Vaughn Thompson, lying face down on the ground with a gunshot wound to the head.
Mr. Bobby Thompson instructed Mr. Mitchell to remain with Mrs. Elma Thompson, and then took Mr. Mitchell's gun and left in his automobile in the direction Mitchell saw the man leave.
Mr. Bobby Thompson testified he lived on Highway 225, approximately 300 yards north of a store he owned called The Outdoorsman. He stated he was the father of the victim, Vaughn Thompson.
On September 14, 1981, around 8:30 p.m. he was in his living room when his wife ran to the door and told him she thought she heard shots from the direction of the store. As they ran to their automobile, they heard three more shots from the direction of the store. They drove to the store and while still a hundred and fifty yards from the store they saw a short black man wearing a tee-shirt run out of the store. Mr. Thompson estimated the man's weight at 135 to 140 pounds.
When the Thompsons arrived at the store, Mr. Thompson saw his son, Vaughn, lying face down in the driveway. He jumped from the automobile and held and called to his son, but received no response. He then took Mr. Mitchell's shotgun, got into his automobile and drove in the direction Mr. Mitchell saw the man run towards. He traveled only approximately fifty yards south when he saw an automobile on a dirt side-road traveling very slowly. Mr. Thompson increased his speed, but the other vehicle eluded him after three or four miles.
Although Mr. Thompson could not identify appellant as the man he observed at the store, he did recall the appellant coming into the store approximately four or five days before his son was murdered.
Mr. Thompson testified that shortly before the time of his son's death, Vaughn had been building a log cabin from match stems which he glued together onto a beverage flat. He had observed his son using a knife to rake up the matches with the glue on them in building the cabin. The *Page 369 
knife, which Thompson stated he had seen his son use approximately forty times, was positively identified by Thompson as State's exhibit number four. He last remembered seeing the knife approximately two days before his son's death.
The victim's mother, Mrs. Elma Thompson, testified and verified her husband's testimony. She also testified that she had prepared her son's lunch earlier that day and stored it in Tupperware bowls. She had given the bowls to him that morning. Mrs. Thompson stated she was walking along Highway 225 on the side on which the store was located with several people on the morning of September 15, 1981, when her son-in-law discovered the bowls and gave them to her. She in turn gave the items to law enforcement officer Woodrow Overbey. She identified the bowls as State's exhibit six.
Robert Stewart testified he was the chief criminal investigator for Baldwin County on September 14, 1981, and that he was called upon to investigate the death of Vaughn Thompson on that date. Upon arriving at the scene he observed the victim's body lying in front of The Outdoorsman. Officer Stewart stated a bloodhound used in the investigation ran a trail from the body, around the building, over to a dirt road, and then down the dirt road to a location where a vehicle had been parked. In this area a garbage bag was observed by a Lieutenant McDowell. Officer Stewart took the bag into his possession, delivering some of its contents to the lab, and retaining other parts for use by the department in the investigation.
Officer Stewart testified he retrieved from the bag several check stubs and an envelope with the address 311 Montgomery Street. The appellant's name appeared on the check stubs, although one was printed as Arthur Jones Junior, and the others only as Arthur Jones. Officer Stewart also retained a bandage which had strands of hair attached to it and a receipt from a Delchamps market dated September 10.
On September 16, 1981, Officer Stewart went to the 311 Montgomery Street address in Mobile, Alabama. When he arrived at that address he found the appellant sitting at a kitchen table with Detective Pickett. He identified himself to the appellant, and told him he was there to investigate a robbery-homicide. He advised appellant of his Miranda rights, and appellant agreed to talk with him. Officer Stewart recalled that at some point during this initial phase of his interrogation of appellant that appellant was cleaning his fingernails with a pocketknife.
Appellant stated that he had been at home, alone, on the evening of September 14 watching a ballgame on television. During the halftime of the ballgame, he left his apartment to get some ice cream. He did not recall having been in Baldwin County for several months prior to the interrogation by Officer Stewart.
Appellant was asked how long it had been since he had thrown garbage away and he stated it had been two weeks. When he was told that a bag of garbage containing some of his effects had been found, he recalled having dropped a bag of garbage in a trash drop at a Hess gas station during the ballgame halftime.
Appellant stated he had loaned his vehicle, described by Officer Stewart as a blue and white 1976 or 1977 Grand Prix Pontiac, to only one man. That occurred only once, three weeks prior to the interrogation.
Prior to the time frame of the crime ever having been mentioned to appellant, he volunteered the following statement to Officer Stewart:
 "Prior to his arrest, while we were still in the kitchen at his apartment talking to Mr. Jones, he just, out of the open air, says, `Well, y'all are trying to put me over there at 9 o'clock when that murder happened and I wasn't there. I was here in this apartment.'"
Following the interrogation of appellant at his residence, Officer Stewart placed appellant under arrest. During a search of appellant's person pursuant to the arrest, Officer Stewart removed a small pocketknife which he later delivered to the crime *Page 370 
lab. Stewart identified State's exhibit four as being the same knife he had removed from appellant during the search.
On cross-examination, Officer Stewart stated that a knit pullover cap that had holes for eyes cut out in it, so as to resemble a ski mask, was also found on the dirt road approximately twenty feet from where the vehicle had been parked.
Roland Howell, an investigator for the Baldwin County Sheriff's Department, stated he was present when the bag of garbage was found. He observed the name on the return address of an envelope found therein and stated the return was addressed to Abdul Sabir Bakee at 311 Montgomery Street.
Terry J. Malone testified he was the president of Industrial Services. He identified the check pay-stubs found in the garbage bag as having been issued by his company, and identified appellant as the recipient of those checks.
James L. Small, a laboratory administrator for the Department of Forensic Sciences, examined photographs of appellant's tires and of impressions made of the tracks found on the dirt road. He stated the tracks were of the same design, and that the tire in the photograph could have made the tracks in the impression. His examination of a bandage obtained from the garbage bag found on the dirt road indicated the presence of hairs from someone of the Negro race. He also examined State's exhibit four, the pocketknife, and found adhered to it the substance cyanoacrylate, commonly known as super glue.
Mark Evans testified he was employed on the three to eleven p.m. shift at the Hess Oil Company service station on the corner of Springhill and Broad in Mobile, Alabama, on September 14, 1981. He recalled seeing the appellant come in and get gas sometime after 9 p.m. that evening. He did not see appellant place any trash in the station's dumpster. It would have been possible for someone to place trash in the dump without his knowledge, however, because he did not have a full view of it from where he worked.
Larry Shakir, a friend of appellant, testified he received a pistol from appellant on the morning of September 15. He had previously requested that appellant find him a weapon for his personal use and protection. Upon learning of the murder and of appellant's possible involvement from a news report the following morning, Mr. Shakir "panicked" and threw the gun into Mobile Bay. He did not recall the make or caliber of the gun.
Mr. Shakir also testified that at one point in time, appellant had changed his name to the Muslim name of Baagee. Because the name was Arabic, he was not sure of its pronunciation.
On examination by defense counsel, Mr. Shakir identified State's exhibit four as a knife which belonged to appellant. However, upon further examination by the State, he admitted having earlier identified another knife as the one which appellant owned. He could not say which, if either, of the knives ever belonged to appellant, but only that they were similar to appellant's knife.
Curtis Lassiter, the victim's brother-in-law, testified he found a brown grocery bag containing Tupperware on the morning after the victim was murdered. He located the bag approximately one hundred and twenty-five yards south of The Outdoorsman on the right hand side of the road. The bag was about half way between the store and the nearby dirt road. When he saw the sack it was sitting flat on the ground and the top was open. He took the bag to the store and gave it to Mrs. Thompson.
Dr. Leroy Riddick, a State forensic pathologist, testified he determined the victim's death was caused by injuries to the brain resulting from three gunshot wounds to the head and neck. The body also evidenced blunt force trauma, which indicated the victim had been struck with an object.
Bobby Stewart was recalled by the State and testified appellant told him during the conversation at appellant's house that he *Page 371 
had recently cut his finger while changing a tire.
Mr. Bobby Thompson took the stand again and testified that after the robbery a bag containing four hundred dollars was found, as well as two hundred dollars in the cash register. Because it was time to buy gasoline and beer for the store, which were purchased in cash, there should have been approximately a thousand dollars in cash at the store. He had not seen the money, but had been told by his son that it was available in the store for those purchases.
Roland Howell retook the stand and testified The Outdoorsman was located in Baldwin County, Alabama. The State rested at the close of his testimony.
Appellant moved to dismiss the State's case for failure to establish a prima facie case in that the State failed to prove a robbery occurred. The trial court denied appellant's motion.
Arenzo Thigpen, called by appellant to testify, stated he was a friend of appellant. He recalled having twice borrowed appellant's automobile, once on a Sunday and once on a Tuesday. He denied any connection with the shooting in Baldwin County, and stated he had not been in Baldwin County within the last year.
Appellant rested at the close of Thigpen's testimony. The State presented no rebuttal, and appellant's motion to exclude the State's evidence and for a directed verdict was denied.
 I
Appellant contends that reversible error occurred when the prosecutor commented on evidence which had not been formally admitted at trial while making his closing argument to the jury. The items in question, State's exhibit number six, are the Tupperware bowls and the brown paper grocery bag which contained them, which were found near the bag of garbage at the crime scene. The record reflects the following identification was made during the testimony of the victim's mother:
 "Q Mrs. Thompson, I will ask you to look into the bag that's been marked for identification as State's Exhibit Number Six. I will ask you if you can recognize the items inside the bag which have been marked for identification.
". . . .
 "Q I asked you to look at what's been marked for identification as State's Exhibit Six. Do you recognize that item?
"A Yes, I do.
 "Q Could you tell the ladies and gentlemen of the Jury what that item is?
 "A It's the bowls, Tupperware bowls that I gave my son his lunch and breakfast in that morning, September 14th.
 "Q After September 14th, when was the next time you saw that item?
"A The next morning, September the 15th.
"Q And where did that item come from?
"A It was found.
"Q Where?
"A On the road below the store.
". . . .
 "Q And was that item found — on what side of the road, what side of 225?
"A On the same side as the store.
"Q Were you with the people that found the item?
"A Yes, I was. We were all walking.
"Q Who was that?
"A My son-in-law.
"Q Who was it given to?
"A Me.
"Q And after you had it, who did you give it to?
 "A I think Mr. Woodrow Overbey, one of the law enforcement officers. I'm almost certain it was Woodrow Overbey."
Later in the trial, Curtis Lassiter, the victim's brother-in-law, testified he found a brown grocery bag containing Tupperware on the morning following the murder. He took the bag, which he found on the ground between The Outdoorsman and the dirt road, and gave it to Mrs. Thompson. *Page 372 
During the presentation of the appellant's case, appellant conducted the following examination of appellant's witness Arenzo Thigpen:
 "Q I'm going to show you a bag marked as State's Exhibit Six and ask you to look inside of there.
"A Okay.
"MR. WILKINS: Go ahead, you can look.
 "THE WITNESS: (Witness reviewing instruments and documents.) What are we looking for?
"BY MR. ENFINGER:
"Q Did you look at the items in the bag?
 "A Not really. Let me check it out again. I really don't know what I am supposed to be looking for.
"Q Have you ever seen those items before?
 "A Not as I know of. I seen a lot of items that look like that. It's Tupperware. Most housewives have them. I don't know whether I seen them before or not."
Although the record does not indicate that the Tupperware and grocery bag were formally introduced into evidence, they were marked for identification, identified by a State's witness, displayed before the jury, and commented upon by several witnesses. The articles were, therefore, evidence in the case.Hope v. State, 378 So.2d 745 (Ala.Cr.App.), cert. denied,378 So.2d 747 (Ala. 1979); Simpson v. State, 51 Ala. App. 279,284 So.2d 734 (1973). As such, the articles were proper subjects for the prosecutor to comment upon and draw reasonable inferences from during his closing argument. Hope, supra.
The articles were repeatedly referred to by the prosecutor and appellant's counsel during their examinations of various witnesses. As indicated above, appellant's counsel questioned his own witness on direct examination concerning the articles. Both parties having treated the articles as evidence in the presence of the jury, there is no error. Golston v. State,371 So.2d 471 (Ala.Cr.App. 1979).
Moreover, our review of the record indicates that it was appellant's own counsel who first commented upon the articles during closing arguments, as follows:
 "Nonetheless, he was going back and forth there, the short black man, you know, even though the vision was so good to say it was a short black man and had on a t-shirt and low and behold, here he is carrying this paper bag, and I believe, it was this paper bag.
 "Ladies and gentlemen, there is no doubt about it. That's just reasonable. This paper bag, and then, some kind of dark plastic bag, garbage bag.
". . . .
 "No question that the Tupperware was found out there. No question about that whoever was running away from that store was carrying that Tupperware.
". . . .
 "But let's clear away the smoke screen that the DA has tried to put in here about the garbage and the glue on the knife. The knife, the Tupperware, and all of this other stuff."
We fail to see, therefore, how appellant could have been harmed by the prosecutor's similar reference to the articles during his subsequent closing argument.
 II
Appellant contends the wording of the warning he received prior to making a statement to police was insufficient to advise him of his constitutional rights under Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Hence, he argues his statements were inadmissible at trial.
Officer Robert Stewart testified he advised appellant of his constitutional rights in the following manner prior to interrogating him at his home on September 16, 1981:
"Q Now, what is that card, if you will?
 "A It's a warning of constitutional rights and a waiver.
"Q And how did you use that card to assist you? *Page 373 
 "A I used it in reading the Defendant his constitutional rights.
 "Q And would you read to this Jury the rights that you read to the Defendant at that time?
 "A Yes, sir. `You have the right to talk to a lawyer, have him with you while you are being questioned, if you want a lawyer but cannot afford one, the Court will appoint one for you.
 "`You have the right to remain silent, anything you say can and will be used against you in a Court of law.'
"Q All right, sir. Where were you when this was done?
"A Seated at the kitchen table.
"Q Who else was seated at the table?
 "A Mr. Jones and Detective Pickett and Roland Howell; but I also went one step farther and advised him that should he decide to talk to us and any time during that conversation that he wished to, he could stop talking and request an attorney at any time."
Officer Wayne Ivie testified that he also read appellant his constitutional rights, shortly before Officer Stewart arrived at appellant's home on September 16, 1981. Officer Ivie testified he instructed appellant as follows:
 "A Yes, sir. I advised him that he had the right to remain silent and anything that he said could and would be used against him in a Court of law, that he had the right to have an attorney present, and if he couldn't afford an attorney, one would be appointed for him. And at any time during the questioning, if he so desired, the questioning would be stopped. I asked Mr. Jones if he understood the rights and he replied that he did.
"Q Was anyone else present at the time?
"A Sergeant Pickett."
Officer Walter Pickett testified he was present and heard both Officer Stewart and Officer Ivie advise appellant of his constitutional rights.
Appellant, citing an annotation which follows the Miranda
decision at 16 L.Ed.2d 1294, contends the warnings appellant received were insufficient in particular because they failed to use the precise language as formulated in the annotation, which states that a suspect "has the right to consult with, and have present prior to and during interrogation, an attorney either retained or appointed. . . ." 16 L.Ed.2d 1300. (Emphasis added.) Appellant's argument has specific reference to the officer's failure to use the term "prior to" in warning appellant of his right to counsel.
The Miranda decision requires no talismanic formulation of the warnings to be given to a criminal defendant as to the constitutional rights protected by that decision. California v.Prysock, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). Reviewing the language used to inform the appellant herein of his right to appointed counsel, we find, as did the court inPrysock, supra, that "[t]his is not a case in which the defendant was not informed of his right to the presence of an attorney during questioning . . . or in which the offer of an appointed attorney was associated with a future time in court. . . ." Prysock, supra, at 361, 101 S.Ct. at 2810. (Citations omitted.) There was no error in this regard.
 III
Appellant asserts the trial court's action in rejecting the advisory sentence of life without parole recommended by the jury, in order to elevate his sentence to death, was error. Appellant's arguments have been precluded, however, by our recent decision in Murray v. State, 455 So.2d 53 (Ala.Cr.App. 1983). There was no impropriety in the trial judge's decision to sentence appellant to death.
 IV
During the State's closing argument, the following appears in reference to the knife found on appellant's person at the time of his arrest: *Page 374 
 "Vaughn Thompson's father identified that item for you. And that time, when Arthur Jones was placed under arrest, this item of evidence was found in Arthur Jones' pocket. This item of evidence had the glue on it that that young Thompson boy was making his little model hobby with. And this item, this item came out of Vaughn Thompson's pocket and wound up in the Defendant's pocket. That's what the lab man said. He said the glue on that knife was consistent with the type of glue that was found that Vaughn Thompson had been using at the store.
 "MR. ENFINGER: Judge, we're going to object to the prior remark made by the Prosecutor on the basis that there was no testimony from any State's witness that that glue that was found on the blade of the knife was found at the scene of the crime.
 "THE COURT: Ladies and gentlemen of the Jury, let me instruct you at this time that you are only to consider the evidence that you have heard from the witness stand and only what your recollection of what that evidence is and not what the attorneys are saying to you. They are only arguing the case to you as to how they remember it and how they recollect it. The facts as they best remember is what they are trying to portray. They are gathering their reasonable inference therefrom, so you consider only what comes from the witness stand as you remember it."
Appellant argues that the prosecutor's remark misstated the testimony and stated a fact which was not supported by the evidence, thus creating reversible error. The State on appeal does not deny that there was never any evidence presented that the laboratory expert stated the glue used on the cabin model, nor any glue samples taken from the victim's possession at the scene of the crime, were of the same glue type as that found on the knife.
In the State's closing argument in rebuttal, erroneous reference was again made to the laboratory expert's testimony, as appears below:
 "And I want you to look at that knife when you get it back there in that Jury Room. You look at that knife very closely. You look up under this thing and you look at it and you see what that substance is that's on the knife. Mr. Small told you from the lab that it was a kind of whatever type glue he said. It was the same type glue used in the model, a Superglue."
The testimony of the laboratory expert, Mr. James Small, indicated his tests revealed that the material on the knife was a glue of the cyanocrylate group. He also stated that four samples of glue he received from Officer Roland Howell were of the same cyanoacrylate group as the glue on the knife. However, there was no testimony by Mr. Small, Officer Howell, or anyone else as to the origin of the glue samples obtained by the officer which were compared with the glue on the knife.
Mr. Small also testified that he received a "model," a bottle labeled as Elmer's glue, and a jar lid containing glue from Officer Stewart. There was no testimony, however, that any of those items contained glue of the cyanoacrylate group.
While counsel should have wide latitude in arguing reasonable inferences from the evidence, counsel should not be allowed to argue as a fact that which is not supported by the evidence presented during trial. Brown v. State, 374 So.2d 391
(Ala.Cr.App.), affirmed, 374 So.2d 395 (Ala. 1979). It is without question that the prosecutorial arguments quoted above were factual misstatements of Mr. Small's testimony which fall within this prohibition. When the prosecutor asserts a fact not in evidence, which is prejudicial to the accused, error occurs.Diamond v. State, 363 So.2d 109 (Ala.Cr.App. 1978). However, not every argument of a fact not in evidence is so prejudicial as to necessarily affect the substantial rights of the defendant. See, Brown, supra at 396; Flint v. State,370 So.2d 332 (Ala.Cr.App. 1979). *Page 375 
In order for unsupported prosecutorial statements of fact to require reversal, the objectionable statements must be (1) made as of fact, (2) without support by any evidence, (3) pertinent to the issues, and (4) have a natural tendency to influence the finding of the jury. Tillman v. State, 374 So.2d 922
(Ala.Cr.App. 1978), cert. quashed, 374 So.2d 926, 927 (Ala. 1979); Flint, supra.
The prosecutorial statements in question clearly violated factors (1) and (3) above. The prosecutor's argument was phrased as a statement of fact, and not as an inference from the facts. The knife's connection to the victim by the presence of the same type of glue as used in the victim's cabin model was clearly pertinent in proving the State's entirely circumstantial case.
As to factor (2), we cannot say that the prosecutor's argument was entirely unsupported by any evidence at trial. The scientific expert did testify that the glue on the knife and certain glue samples from the officers investigating the case were of the same chemical group. The prosecutor may have argued as a legitimate inference from the testimony that a knife which was both identified by the victim's father and which bore evidence of glue must have been the victim's knife. Yet, there still was no basis for his statement that the expert actually identified the glue samples from the crime scene as the same type as the glue on the knife.
We look finally, and crucially, then, at factor (4) to determine whether the natural tendency of this misstatement of the expert's testimony was to influence the finding of the jury against appellant's interests.
The State's case against appellant, while entirely circumstantial, was in no wise dependent upon the expert's testimony on the identity of the glue type to establish an overwhelming case against appellant. Eye witnesses described the assailant's race, height and weight, although they were unable to identify him because of the distance from which they viewed him. One witness could see that the assailant carried a brown paper sack and a plastic garbage bag. The victim's father observed an automobile on a nearby dirt road which was located in the direction he had seen the assailant flee. He gave chase, but eventually lost the automobile. The victim's father also positively identified the knife found in appellant's possession as the one his son had owned.
Bloodhounds brought to the murder scene tracked a trail directly to the dirt road where an automobile had been parked. In this area, a bag of garbage containing check stubs with appellant's name, an envelope with appellant's return address, and a bandage with strands of hair of Negro origin were found. Between the store and the dirt road, a brown paper sack containing Tupperware from the victim's lunch was found.
When police arrived to investigate appellant, they found in his possession a knife later identified by the victim's father as belonging to the victim. When questioned about discarding garbage, appellant changed his story about not disposing of any refuse, upon learning garbage had been found which was connected to him. Appellant admitted having recently cut his finger, but denied being in Baldwin County. His story about discarding the garbage at the Hess station was refuted by police investigation of the station attendant. Finally, without having been told of the time frame of the crime, appellant volunteered a denial of having been at the crime scene at the very time the crime was committed.
Laboratory expert Small testified a tire print taken from the dirt road was of the same design as the tread of the tires on appellant's automobile. And while the expert never connected the glue on the knife with the glue from the crime scene, he did find that glue was present on the knife. The victim's father had earlier testified that his son used his knife in gluing match sticks on a model of a cabin. Thus the identification of the glue would only be cumulative evidence of the identification of the knife previously made by the victim's father. *Page 376 
A friend of appellant's testified to having received a gun from appellant on the morning following the murder, which he later disposed of because he feared it was connected to the murder.
In light of the entirety of the circumstantial evidence against appellant, we do not view the prosecutor's misstatement in question as having a natural tendency to influence the jury against appellant so as to have denied appellant of a fair trial. Flint, supra. We find this to be a case where the evidence as to the identity of appellant was so overwhelmingly in favor of the State that it is inconceivable that a reasonable jury would have returned a verdict of not guilty. See Brown, supra. The argument of a fact not in evidence was not so prejudicial as to have necessarily affected the substantial rights of appellant. See, Brown, supra, at 396.
We are influenced too by the fact that the trial court did not overrule appellant's objection, but rather immediately proceeded to instruct the jury as quoted supra. Appellant did not further pursue his objection, which may be taken to indicate he found the judge's instruction sufficient at that time to cure any misapprehension by the jury. As well, appellant's counsel stated the following to the jury in closing argument which followed the prosecutor's initial statement:
 "Now, a pocketknife, I guess a lot of gentlemen have pocketknives; but using pocketknives, they use them on all kinds of things. So many things, you can use them for so many things but you remember when I kept asking that man about the different qualities of that glue and could it have been any other type of glue and don't all these types of other glues have certain kinds of qualities. And you know, there was never any glue introduced that where the DA brought it in and said, look, this was the glue that the young Thompson fellow used working with his model and used working with his knife. Now, did you run tests on that specific glue? Did they? That was never mentioned."
Finally, the trial court instructed the jury during its oral charge as appears below:
 "The statements or assertions of counsel are not evidence in the case. You take the testimony of the witnesses together with all proper and reasonable inferences therefrom, apply your common sense, and in an honest and impartial way, you determine what you believe to be the truth."
In light of these actions, we do not believe the prosecutor's statement created reversible error. See, Weaver v. State,402 So.2d 1099 (Ala.Cr.App. 1981); Meridith v. State,370 So.2d 1075 (Ala.Cr.App.), cert. denied, 370 So.2d 1079 (1979).
 V
Reviewing this case in light of § 13A-5-53 (a), Code of Alabama 1975, we find that:
 (1) there was no error adversely affecting the rights of the appellant made in the sentencing hearing;
 (2) the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence [1];
(3) that death was the proper sentence in this case.
In determining the propriety of the sentence of death, we have determined in accordance with § 13A-5-53 (b), Code of Alabama 1975, that the record indicates no evidence that the trial judge imposed the sentence of death under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances evidenced by the record places us in accord with the trial judge's decision to fix appellant's punishment at death. We find, as did the trial judge, no evidence that any mitigating circumstances existed, statutory or otherwise, in appellant's favor. We *Page 377 
agree with the trial court's finding of the three aggravating circumstances.
The record indicates the crime was committed while appellant was under sentence of imprisonment, although he was serving the latter part of this sentence while on parole. Also sustained by the record is the trial court's finding that appellant was previously convicted of another felony involving the use or threat of violence to the person. Finally, the evidence presented at trial supports the trial judge's finding that the capital offense was committed while the appellant was engaged in the commission of a robbery.
Weighing the gravity of the aggravating circumstances against the total lack of mitigating circumstances, we are of the opinion that the death penalty is the proper sentence in this case.
Our review assures us that the death penalty is being imposed in similar cases, and therefore the sentence of death is not excessive or disproportionate as applied to the appellant in this case. See Watkins v. State, [Ms. 6 Div. 925, July 5, 1983] (Ala.Cr.App. 1983); Raines v. State, 429 So.2d 1104
(Ala.Cr.App.), affirmed, 429 So.2d 1111 (Ala. 1982).
No error prejudicial to the substantial rights of appellant having been found, this case is affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial court's findings of fact, setting forth its findings as to aggravating and mitigating circumstances, are attached as Appendix A.
 APPENDIX A IN THE CIRCUIT COURT OF BALDWIN COUNTY, ALABAMA CRIMINAL DIVISION STATE OF ALABAMA, Plaintiff, VS. ARTHUR JONES a/k/a ARTHUR JONES, JR., Defendant. CASE NO. CC 81-610 SUMMARY OF FINDING OF FACTS FROM THE TRIAL
On September 14, 1981, several witnesses heard gun shots being fired at the Outdoorsman Store located on Alabama Highway 225 where Baldwin County Road 40 intersects said highway in Baldwin County, Alabama. Two of the witnesses gave a general description of the individual leaving the said store carrying in each hand a bag. One of the bags was identified as a brown paper bag. The description met the general description of the Defendant. This person proceeded from the store and went in a southerly direction to an infrequently used dirt road. A short time after this a car sped out of the said dirt road on Highway 225 and went in a southerly direction at a high rate of speed towards the Mobile Bay Causeway. Approximately one-half the distance between the Outdoorsman Store and from the point which the said vehicle left, was found a brown paper bag containing tupperware which the victim's mother identified his noon lunch had been in. At a point where the car sped away, was found a garbage bag which contained check stubs and envelopes on which was written the Defendant's name and address. The Defendant stated he had not been in Baldwin County in six or seven weeks. Bloodhounds traced a path which matched the movements of the person described by the witnesses to a point where the garbage was found and the car sped away. There was also found there in the garbage a bandage.
Photographs were made of the tire tracks on this road which was testified to by a State Toxicologist as being similar to those tires found on the Defendant's vehicle. The State Toxicologist also testified that there were hairs on the bandage which could be positively identified as those of a black person, Defendant being of the black race.
When the Defendant was being interrogated by a Baldwin County Investigator, the Defendant said that they couldn't put him in Baldwin County at the Outdoorsman Store at 9:00 p.m. of the night of the shooting. When asked how he knew what time the shooting occurred, he became nervous *Page 378 
and upset and had no explanation. The Defendant also told the officers that he had a cut and had thrown the bandage which he had placed on it in his garbage. When first questioned by the investigators concerning garbage, the Defendant said that he had had no garbage for approximately ten days to two weeks. On being informed that a sack of garbage with the items as mentioned above was found near the scene of the crime, the Defendant changed his story and he told them that he had a few days prior to that time taken his garbage to a Hess Service Station and was directed by the attendant where to deposit it. The Defendant identified the attendant at the station to the investigators and the attendant at trial denied having directed the Defendant where to deposit his garbage. The Defendant denied to the investigators that he had a pistol, but a witness testified that the day following the robbery that the Defendant gave him a pistol. A day or so later when the witness heard that the Defendant had been charged with the murder of Vaughn Thompson, he became frightened and drove to the Mobile Bay Highway and threw the pistol in the bay.
At the time that the Defendant was arrested, a knife was found on the Defendant which the victim's father identified as belonging to the victim. There was residue on the knife which the State Toxicologist identified as being a similar substance.
The jury concluded beyond a reasonable doubt from this and other evidence that the Defendant was guilty of the Capital Offense of Robbery Murder as charged in the indictment. The Court concurred in their verdict.
 SENTENCING HEARING BY THE COURT
The Court having conducted a hearing pursuant to Title13A-5-47 of the Code of Alabama, 1975 as amended to determine whether or not the Court will sentence Arthur Jones a/k/a Arthur Jones, Jr. to death or to life imprisonment without parole and the Court having considered the evidence presented at the trial and at the sentencing hearing before the jury and the hearing conducted before the Court along with the pre-sentence investigation report which has been made part of this record, the Court makes the following determination.
 AGGRAVATING CIRCUMSTANCES
The Court first considers the aggravating circumstances as outlined and described in Title 13A-5-49; Code of Alabama:
(1) The Court finds that the capital offense was committed by Arthur Jones a/k/a Arthur Jones, Jr. while he was under sentence of imprisonment, although he was serving the latter part of his sentence on parole at the time;
(2) The Court finds that the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person;
(3) The Court finds that there is no evidence that the Defendant did knowingly create a great risk of death to many persons;
(4) The Court finds the capital offense was committed while the Defendant was engaged in the commission of a robbery;
(5) The Court finds the capital offense was not committed for the purpose of avoiding or preventing a lawful arrest effecting an escape from custody;
(6) The Court finds that the capital offense was not committed for pecuniary gain;
(7) The Court finds the capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
(8) The Court finds that the capital offense was not especially heinous, atrocious or cruel compared to other capital offenses;
The Court finds beyond a reasonable doubt that the aggravating circumstances described in Title 13A-5-49 and set out above in subparagraphs (1), (2) and (4) particularly apply to the Defendant Arthur Jones a/k/a Arthur Jones, Jr. in this case. *Page 379 
 MITIGATING CIRCUMSTANCES
The Court now considers the mitigating circumstances as described and set out in Title 13A-5-51, Code of Alabama:
(1) The Court finds that the Defendant has a significant history of prior criminal activity;
(2) The Court finds that the capital offense was not committed while the Defendant was under the influence of extreme mental or emotional disturbance;
(3) The Court finds that the victim was not a participant in the Defendant's conduct or consented to it;
(4) The Court finds that the Defendant was not an accomplice in the capital offense committed, but was in fact the principal who robbed and intentionally killed the victim Vaughn Thompson;
(5) The Court finds that the Defendant did not act under extreme duress or under the substantial domination of another person;
(6) The Court does not find that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and
(7) The Court finds that the age of the Defendant is not a mitigating circumstance.
 CONCLUSION
The Court having considered the aggravating circumstances and the mitigating circumstances and after weighing them, the Court is convinced beyond a reasonable doubt and to a moral certainty and it is the judgment of the Court that the aggravating circumstances far outweigh the mitigating circumstances and that the death penalty should be imposed.
The Court is fully aware of the great responsibility that is placed on the trial judge in cases of this magnitude. The Court struggled long and hard with the decision that it must make in this case, and in making the determination to override the decision of the jury's advisory sentence of life imprisonment without parole. The Court must follow the dictates of its own conscience.
The Court is not chastising or inferring that the jury was lax in their responsibility. The Court feels that it is its responsibility to follow the law as written, and that society must be protected and that an example must be set forth and made apparent so that our citizens may be secure in their homes and businesses.
The Court therefore, rejects the advisory sentence of the jury in this case.
It is therefore, considered and adjudged by the Court that Arthur Jones a/k/a Arthur Jones, Jr. is guilty of the capital offense charged in the indictment and that he intentionally killed Vaughn Thompson in the course of a robbery in the first degree.
 Arthur Jones, do you have anything to say before the sentence of law is passed on you? The Defendant has nothing to say.
It is ORDERED, ADJUDGED and DECREED that you, Arthur Jones a/k/a Arthur Jones, Jr. suffer death by electrocution at any time before the hour of sunrise on the twentieth (20th) day of May, 1982 inside the walls of William C. Holman Unit of the Prison System at Atmore, Alabama in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore, further ORDERED, ADJUDGED and DECREED by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in case of his death, disability or absence, his deputy or in the event of the death, disability or absence of both the Warden and his deputy, then the person designated Administrator by law for such purpose at any time before the hour of sunrise shall on the twentieth day of May, 1982 inside the walls of William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said Arthur Jones, a/k/a Arthur Jones, Jr., a current of electricity of sufficient intensity to cause *Page 380 
his death and the continual application of such current through the body of the said Arthur Jones a/k/a Arthur Jones, Jr. until the said Arthur Jones a/k/a Arthur Jones, Jr. be dead, and may Almighty God have mercy on your soul.
ORDERED this 19th day of February, 1982.
 /s/ Harry J. Wilters, Jr.
CIRCUIT JUDGE Twenty-eighth Judicial Circuit Baldwin County, Alabama