[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1263 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1264 
 On Return to Remand
The appellant, Angela Kaye Talley, was indicted on September 18, 1990, in Walker County, for the capital offense of "murder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire," see Ala. Code 1975, §13A-5-40(a)(7). The indictment reads, in pertinent part, as follows:
 "The Grand Jury . . . charge that . . . Angela Kaye Talley . . . did intentionally cause the death of DONALD HOYT TALLEY, by shooting him with a shotgun, for a pecuniary or other valuable consideration, to-wit: proceeds from a Life Insurance policy on the life of DONALD HOYT TALLEY issued by State Farm Life Insurance Co., policy # LFO3919947, with a face value of $10,000.00, or proceeds from a Life Insurance policy on the life of DONALD HOYT TALLEY issued by Liberty National Life Insurance Co. (A Torchmark Co.), policy # A006283310, with a face value of $50,000.00, or proceeds from a Life Insurance policy on the life of DONALD HOYT TALLEY issued by Protective Life Insurance Co., Alabama Power group policy # G-D-1905-R, with a face value of $10,000.00, or proceeds from a Life Insurance policy issued by Metropolitan Life Insurance Co., on the life of DONALD HOYT TALLEY with a face value of $12,500.00 on basic coverage and a face value of $99,700.00 on optional coverage, both being on the life of the said DONALD HOYT TALLEY and being Alabama Power Co., group policy 27952-G, in violation of the Code of Alabama 1975, § 13A-5-40(a)(7). . . ."
At the arraignment, the appellant pleaded not guilty and not guilty by reason of mental disease or defect. Before trial, the appellant withdrew her plea of not guilty by reason of mental disease or defect. On February 4, 1993, a jury found the appellant guilty of the capital offense charged in the indictment. On the same date, the appellant with the advice of counsel, with the consent of the state, and with the approval of the court waived the participation of the jury in the sentence hearing and waived the sentencing hearing before the trial court as permitted in § 13A-5-46; and agreed to be sentenced immediately by the trial court without further hearing. Upon the state's recommendation, the trial court sentenced the appellant to life imprisonment without the possibility of parole. The record reflects that the requirements of §§ 13A-5-44(c) and 13A-5-46(a), in reference to the sentencing procedure, were met. The sentencing order of the trial court reads, in pertinent part, as follows:
 "Now, on this 4th day of February, 1993, the defendant, Angela Kaye Talley, being in open Court accompanied by her attorneys, Hon. David Luker and Hon. Jeff Bramer, having been convicted by the jury in Case Number CC90-498. The jury having found the defendant guilty of capital murder as charged in the indictment. And the jury sentencing hearing and Court sentencing hearing having been waived by the [defendant], the State and the Defense with the consent of defendant and the defendant *Page 1265 
agreeing to be sentenced immediately, and upon recommendation by the State and the family of the deceased that she be sentenced to life without parole, the defendant, Angela Kaye Talley, being asked by the Court if she had anything to say as to why the judgment of the Court under the sentence of law should not be pronounced upon her said no.
 "It is, therefore, ORDERED, ADJUDGED AND DECREED BY THE COURT that the defendant, Angela Kaye Talley, is guilty of the capital offense as charged in the indictment in accordance with the verdict of the jury in this case and it is the sentence of law that the said Angela Kaye Talley be sentenced to the penitentiary of the State of Alabama for life without parole."
The record shows that the appellant conspired with her boyfriend, Kendall Pinyan, to kill her husband, Donald Hoyt Talley. Her motive for engaging in the conspiracy was to be free of Talley so she could marry Pinyan and the fact that upon Talley's death she stood to receive approximately $200,000 in life insurance proceeds.
On the night of June 19, 1990, pursuant to an understanding between the appellant and Pinyan, she sent her husband to an isolated rural area of Walker County, ostensibly to help her brother, who she told her husband had had automobile trouble and had broken down. When Talley arrived at the place he had been directed to, Pinyan shot him in the chest with a load of buckshot from a 10-gauge shotgun, as Talley sat in his pickup truck, killing him instantly.
Pinyan was also indicted for the capital offense. Before trial, he entered into an agreement with the state pursuant to which he agreed, in return for testifying against the appellant, to plead guilty to murder and receive a sentence of life imprisonment. During the trial in this case, he was not called to testify by the state; however, he was called as a witness by the appellant. He refused to answer any questions put to him by the appellant, claiming his Fifth Amendment privilege not to incriminate himself.
The theory of the appellant's defense was that she conspired with Pinyan to kill her husband because he allegedly physically abused her over the years and not because she would receive insurance proceeds upon his death. Her counsel argued that if she was guilty of anything, it was murder — but not capital murder. The appellant presented Dr. Lenora E. Walker, a psychologist, as an expert witness who testified that, in her opinion, the appellant's reports of abuse were genuine and that she had been suffering from "battered spouse syndrome" for at least five years. The state presented Dr. Alice Brille, a psychologist, as an expert witness in rebuttal; Dr. Brille contradicted the testimony of the defense's expert, testifying that the appellant did not have the symptoms of battered spouse syndrome, but, on the contrary, participated in the killing of her husband because of money, anger at her husband, and love for Pinyan. The appellant testified and admitted conspiring with Pinyan to kill her husband. In fact, she admitted to committing the capital offense charged in the indictment. During cross-examination, she testified as follows:
 "Q. [Prosecutor]: Did you conspire with Kendall Pinyan to have your husband killed?
"A. [Defendant]: Yes, I did.
". . . .
 "Q. Your plans were to get with Kendall, get the kids, and live happily ever after, right?
"A. That's what I thought, yeah.
 "Q. And, you were going to be able to do it because you would have about $200,000; wouldn't you? That's what you thought?
"A. That's what I thought, yes.
 "Q. For the average Walker Countian, you would be on easy street?
"A. Yes."
The appellant does not question on appeal the sufficiency of the evidence to support her conviction for the capital offense charged, and, from our review of the record, we believe that the evidence of guilt of the capital crime is overwhelming.
On original submission, this case was remanded to the trial court on June 17, 1994, with instructions that it conduct an evidentiary *Page 1266 
hearing to determine whether the state exercised its peremptory strikes in such a manner as to discriminate against prospective jurors on the basis of gender. Talley v. State, 669 So.2d 1006
(Ala.Cr.App. 1994). The trial court has complied with our instructions and has filed its return, which includes a record of the hearing. We will now address not only the issue pertaining to the state's exercise of its peremptory strikes, but the other issues the appellant raised in her brief to this court on original submission.
 I.
The appellant contends that the trial court committed reversible error in finding that the state provided gender-neutral reasons for using all of its peremptory strikes to remove women from the jury venire. She argues that the reasons given by the prosecutor for using his peremptory strikes to remove women were pretextual, and that the strikes intentionally discriminated against women.
After the trial jury was selected, the appellant moved for a suppression hearing on the appellant's extrajudicial statements and for a Batson[1] hearing on the prosecutor's striking of women from the venire. In making the Batson motion, the appellant advised the trial court of the pendency in the United States Supreme Court of the case of J.E.B. v. Alabama, 511 U.S. 127,114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), which raised the question whether Batson should be extended to the selection of jurors on the basis of gender. The trial court granted the appellant's motions and proceeded to hold the suppression hearing. Upon conclusion of the suppression hearing, the trial court denied the suppression motion, and without comment or objection from the parties, immediately proceeded to trial without holding a Batson hearing. The Batson hearing was not mentioned again during the trial. Since the trial, the United States Supreme Court handed down its decision in J.E.B. v.Alabama, holding that the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender. This holding is retroactive as to all cases pending on direct appeal on the date J.E.B. was decided. Allen v. State, 659 So.2d 135
(Ala.Cr.App. 1994). In extending Batson, the Court stated, "We hold that gender, like race, is an unconstitutional proxy for juror competence and impartiality." J.E.B. v. Alabama,511 U.S. at 129, 114 S.Ct. at 1421.
When the denial of equal protection by the improper use of peremptory challenges is properly and timely alleged, the trial court must evaluate the claim by applying a three-step analysis.
 "The trial court evaluates an objection to the use of peremptory challenges under the three-step analysis set forth in Batson. First, as we have said, a defendant must make a prima facie showing that the state has exercised a peremptory challenge or challenges on the basis of race or gender. Second, once a prima facie showing has been made, the burden shifts to the state to articulate a race- or gender-neutral explanation for striking the prospective jurors in question that is related to the case to be tried. Batson, 476 U.S. at 98, 106 S.Ct. at 1723. The United States Supreme Court recently stated in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), that the second step does not demand an explanation that is persuasive or even plausible. It stated that a legitimate explanation is not necessarily one that must make sense, but one that does not deny equal protection. At this step of the inquiry, the issue is facial validity of the prosecutor's explanation, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed neutral. Id., at ___, 115 S.Ct. at 1771. When the defendant challenges as pretextual the prosecutor's explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991). In the third step, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. *Page 1267 
At this stage, the trial court must consider the persuasiveness of the explanations, and it is also at this stage that 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' Purkett, 514 U.S. at ___, 115 S.Ct. at 1771."
Bush v. State, [Ms. CR-90-1652, December 1, 1995] ___ So.2d ___, ___ (Ala.Cr.App. 1995).
A circuit court's ruling on a Batson objection is entitled to great deference, and we will be reverse such a ruling only if it is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala. 1987); Ex parte Thomas, 659 So.2d 3 (Ala. 1994); Lynn v. State,543 So.2d 709 (Ala. 1988), cert. denied, 493 U.S. 945,110 S.Ct. 351, 107 L.Ed.2d 338 (1989).
The record in this case shows that there were 39 prospective jurors on the venire, 23 of whom were women. The state had 13 peremptory strikes, and the appellant had 12. The state used its 13 strikes to remove women. The appellant struck 2 women and 10 men. The jury consisted of 7 women and 5 men. One man and one woman served as alternates, but were excused before the jury began it deliberations.
At the Batson hearing on remand, the trial court first found the existence of a prima facie case of gender discrimination based on the prosecutor's having used all 13 of his strikes to remove women. It then ordered the prosecutor to explain his strikes. In support of his reasons, the prosecutor introduced into evidence his and his assistant's strike lists, which contained information regarding each veniremember recorded either before trial or during the voir dire examination. He also introduced, over the appellant's objection, the juror questionnaires that had been completed by the veniremembers before trial.
The appellant specifically questions the explanations given by the prosecutor for peremptorily striking four women: Numbers 24, 36, 44, 46. The prosecutor's explanation for striking the four women were as follows:
 Veniremember 24: She was young, 24 years of age; she was involved in a helping profession, she was either a nurse or was trying to become a nurse; would give some credit to the testimony of a psychologist; believed that violence in a marriage was not common; and was generally against the death penalty.
 Veniremember 36: She had seen a psychologist or psychiatrist for depression; would give substantial credit to a psychologist's testimony; agrees with feminists ideals and goals; apparently believes in battered wife syndrome; believes that battered wife syndrome is where a woman is beaten time and time again and believes that it is her fault; had family members who had suffered from depression; and reads romance novels. The prosecutor stated that considering all things together he did not believe that this veniremember was good for the state. He stated that the reading or romance novels indicated that she did not looks at life as it is.
 Veniremember 44: She was young, 24 years of age, and divorced; heard of battered wife syndrome; would give credit to testimony of psychologists; believes that a psychologist can tell what's in your mind; reads true story novels; and has a cousin who runs Daybreak Center, which is a spouse-abuse shelter that deals with battered women.
 Veniremember 46: She was young, 23 years of age, and divorced; would give a great deal of confidence to psychological testimony; had a brother who was an alcoholic; and she thinks that most marriages have violence. The prosecutor had made a note on his records during the voir dire of this veniremember about "physical blows," but could not remember the details. He stated that her youth coupled with the other factors led him to the conclusion that she would not be a favorable witness for the state.
In responding to the prosecutor's explanations for his strikes, the appellant argued:
 Veniremember 24: That even though the veniremember was generally against the death penalty, she stated that she could give it under certain circumstances.
 Veniremember 36: That the reasons given by the prosecutor were sham reasons and *Page 1268 
not believable; and that at least two male veniremembers who were not struck stated that they believed in feminist ideas and two who were not struck stated that they had knowledge of battered wife syndrome.
 Veniremember 44: That the only basis she believed for the prosecutor's strike was that the veniremember was young.
 Veniremember 46: That the veniremember made other responses which would indicate that she would be a good juror for the state, i.e., that she was for the death penalty, was not a feminist, had never heard of battered wife syndrome, had never seen a psychiatrist, and even though she had confidence in psychologists, she could look at all the facts and use her common sense.
The trial court made the following findings in reference to the four veniremembers:
 Veniremember 24: "And, your reasoning there is —. Let me make it clear. She was young, which would not in and of itself qualify in my judgment. Attempting to be a registered nurse, in a helping profession. I question whether that would be. That she was generally against the death penalty. I would think that would cover it."
 Veniremember 36: "She is a feminist. She was seeing a psychiatrist at the time she was on the jury for depression. She is familiar with battered wife syndrome which is one of the defenses in the case. . . . The fact that the state represents to the Court that this witness was struck because she had an understanding or knowledge of battered wife syndrome and that she had been seeing a psychiatrist or has seen a psychiatrist for depression, Court finds that is a valid non-gender reason for striking."
 Veniremember 44: "Court finds that her reliance on psychologists would be a valid non-gender strike."
 Veniremember 46: "Reason is that she would put or had a great deal of reliance on psychological testimony and that she was divorced."
At the Batson hearing, the trial court held that there were gender-neutral reasons for all of the prosecution's 13 strikes, including the 4 veniremembers the striking of whom is specifically challenged in this appeal. The trial court's order states, in pertinent part:
 "In conducting these proceedings the Court finds that a prima facie case of gender discrimination has been established by the appellant pursuant to United States Supreme Court, in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89
(1994).
 "Although the original case was tried beginning January 27, 1993, and a great deal of time has intervened between the date the jury was struck and the date of this evidentiary hearing, the Court proceeded to hear and did accept the State's explanations for using all of its peremptory strikes to remove females from the jury venire.
 "The Court having considered the State's explanations at said hearing and the Court having reviewed the documentary evidence in support of the State's explanations, the Court finds that the State's explanations for striking thirteen female prospective jurors were non-gender based; it is, therefore,
 "THE FINDING OF THIS COURT that the State did not discriminate against prospective jurors on the basis of gender."
The party challenging a strike alleging gender discrimination must first present a prima facie case of gender discrimination. If a prima facia case is made or if the responding party voluntarily gives explanations for the strikes, the responding party must give at least facially gender-neutral reasons, if the challenging party is not satisfied that the reasons advanced by the responding party are the true reasons for the strike, the challenging party has the burden of proving to the trial court that the gender-neutral reasons advanced are merely pretextual.
After reviewing of the record, we find that the trial court correctly found that the appellant presented a prima facie case of gender discrimination by the state in the exercise of its peremptory strikes. We also find, as did the trial court, that the prosecutor articulated facially gender-neutral reasons, which were reasonably specific and related to the case being tried, for all 13 of his peremptory strikes. *Page 1269 
In reviewing this case, we are impressed by the fact that the reasons given by the prosecutor for his peremptory strikes were supported by the record of the voir dire examination, the juror questionnaires (which were in the hands of the parties before trial) and notations made by the prosecutor and his assistant on separate jury lists before or during the voir dire examination. In almost every instance, the prosecutor could support his reasons by pointing to an entry in his notes, the questionnaires, or the record on voir dire. The authenticity of the prosecutor's reasons was strengthened by supporting documentation made long before the prosecutor was called upon to explain his strikes. The fact that the reasons given were supported by such documentation indicates their truthfulness and tends to negate the appellant's contention that the reasons were shams or pretextual.
As noted, the appellant specifically challenges only the reasons given for four of the state's strikes. We have examined the reasons given for the other nine strikes and we find them to be clearly gender-neutral. The reasons are consistent with and essentially the same reasons given for the four strikes in question. Looking at all 13 of the strikes, it is reasonable to conclude that the pattern of the strikes does not suggest discrimination.
The appellant specifically contends that the reasons given by the prosecutor for striking veniremember 24 were inadequate and pretextual. As we have previously noted, the trial court found that the veniremember's equivocal position on the death penalty was a gender-neutral reason for striking her. While her level of opposition to the death penalty would not be sufficient grounds to support a challenge for cause, it would be a sufficiently gender-neutral reason to support a peremptory strike.
In support of her contention that the prosecutor's strike of veniremember 24 was pretextual, the appellant points out in her brief to this court that male jurors C.G. and L.P. served on the trial jury, even though they stated in their jury questionnaires that they were generally opposed to the death penalty. This alleged disparate treatment of the female veniremembers and these two male veniremembers was never brought to the attention of the trial court; it is now urged for the first time on appeal. C.G. stated on voir dire that he was unequivocally opposed to the death penalty, and L.P. was not questioned on voir dire about his views on the death penalty. The fact that the prosecutor did not strike C.G. or L.P. indicates that the state never intended to seek the death penalty in this case. It is apparent after examining the record that the prosecutor, anticipating the appellant's defense, was primarily concerned with striking prospective jurors who would look favorably on a defense of spouse abuse or battered wife syndrome and who would tend to give weight to or believe expert psychological testimony rather than striking those who expressed views on the death penalty. It is obvious that this was the principal concern of the prosecutor in striking the jury, and the pattern of strikes clearly suggest this.
In looking at veniremember 24 and C.G. and L.P. in this light, there is a clear difference. Veniremember 24 was in a health care field, would be knowledgeable to some extent as to the testimony of medical experts, and, according to her answers on voir, would give some credence to the testimony of a psychiatrist. On the other hand, both C.G. and L.P. stated in their questionnaires that they would give "little or no credit" to the testimony of psychiatrists or psychologists. It appears that the trial court, after hearing the prosecutor's reasons for striking the veniremember, seized quickly on the reason related to the veniremember's views on the death penalty, and did not consider the other reasons given, particularly that she would give weight to psychological testimony, which would be a gender-neutral reason and which was the reason accepted by the trial court for the striking of most of the other veniremembers. The trial court will not be placed in error for a proper ruling made for the wrong reason, where the ruling is correct for another reason. Nicks v. State, 521 So.2d 1018
(Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala. 1988). In examining the state's reasons for striking veniremembers, the appellate court may rely on a valid reason and need not address a suspect reason *Page 1270 
when both suspect and valid reasons for a strike has been given. Della-Calce v. State, 654 So.2d 54 (Ala.Cr.App. 1994). Assuming that the reason relied upon by the trial court was suspect, and we do not concede that it was, the trial court would not be placed in error because a valid gender-neutral reason had been given for the strike, i.e., she was either a nurse or was trying to become a nurse, and would give some credence to the testimony of a psychologist.
As to veniremember 36, the trial court held that the prosecutor had shown a facially gender-neutral reason for this strike. It found that she had been or was seeing a psychiatrist for treatment of depression, and that she was familiar with battered wife syndrome. The prosecutor gave as one of his reasons for striking this veniremember that she would give substantial credence to a psychologist's testimony, which is a gender-neutral reason in this case. It is logical and reasonable that the prosecutor would wish to eliminate such a potential juror when he knows that the appellant's defense will primarily be based upon expert psychological testimony.
As to veniremember 44, the gender-neutral reason accepted by the trial court for this strike was that she would place considerable reliance on psychological testimony. In addition to this reason, the prosecutor gave other reasons for his strike, i.e., that the veniremember believes that a psychologist can tell what is in your mind, and that she has a cousin who runs a spouse abuse center for battered women. We find these additional reasons to be gender-neutral.
As to veniremember 46, the gender-neutral reason accepted by the trial court for this strike was "that she would put or had a great deal of reliance on psychological testimony and was divorced." We find this to be a gender-neutral reason, and it is supported by the record.
Based on the reasons given by the prosecutor for his strikes, the scant information offered by the appellant in rebuttal to these strikes, the circumstances noted above, and the deference to be accorded to the trial court's findings on aBatson motion, we conclude that the appellant failed to carry her burden of proving purposeful discrimination as to all of the prosecutor's peremptory strikes, and particularly the strikes of veniremembers 24, 36, 44, and 46. After reviewing the record of this case, we cannot hold that the trial court's finding that there was no gender discrimination with respect to the prosecutor's peremptory strikes was clearly erroneous. Thus, we find that the denial of the Batson motion was proper.
 II.
The appellant contends that the trial court erred when it denied his motion for a mistrial and his motion to designate a member of the jury as an alternate juror. The appellant claims that juror L.P., who served as the jury foreman, falsely answered the following question on his jury questionnaire: "Has there been domestic violence in your family?" He bases this allegation upon the fact that, during the trial, the trial court notified counsel that it had been informed by an attorney who was not connected with the case that the juror's wife was filing for divorce, alleging physical abuse. In reference to this matter, the record shows the following:
 "BY THE COURT: . . . I have been informed by an attorney that [juror L.P.'s wife] is filing for divorce alleging physical abuse, and I have instructed the attorney not to serve him while he is serving on the jury nor correspond with him in any way, form, or fashion. And, that is not to go any further.
 "BY MR. LUKER [defense attorney]: Your Honor, our response — We found out yesterday afternoon when you made us aware of it and after thinking about it all night and looking at the variables, we feel the only proper thing to do is to excuse this juror immediately, before there is any chance he may contaminate this jury pool.
 We think that if these allegations that have been sworn to by his wife and I assume have already been filed in circuit court —
"BY THE COURT: No. *Page 1271 
"BY MR. LUKER: They have not been filed?
"BY THE COURT: No.
 "BY MR. LUKER: These allegations that his wife is making, if they are in fact true, then this juror has lied in his questionnaire to some of the answers and may have lied during voir dire, which would cause tremendous problems, both in selecting a fair and unprejudiced jury in our process of communicating with the jury.
 "He may have polluted this pool and we move this court to remove him immediately from this jury.
 "Of course, the court has already stated his position on that and I am assuming the court won't remove him and in light of that I will make a motion for a mistrial on the grounds that this jury pool is or will be polluted and contaminated by this man's belief that he has failed to give up. He has lied to us. That has a bearing on the way we struck.
 "As an alternative, if this court does not grant a motion for a mistrial, I would beg the court without waiving any of the argument that I may have and without waiving any of the defendant's rights to a mistrial, we would beg the court to make this juror an alternate so he would not be on the panel that ultimately decides this case.
 "BY MR. BAKER [prosecutor]: First of all, how has this juror lied? There has been nothing introduced this morning to show that this juror lied. . . . [I]f it is [L.P.], I believe on his questionnaire, and I'm not stating this as fact but just from memory, that he had an assault charge filed against him and it was dismissed.
 "If, in fact, that was done, the records of the Circuit and District Court are less that 50 feet away from where we struck the jury and the defense had employed a competent psychologist to assist and public records are available for inspection and this man told us on his questionnaire that he had charges filed against him for assault — This is all said from memory. I don't have the questionnaire before me. But, if he in fact did disclose that, then he did put everybody on notice. If we failed to go into it in more detail, that's just information we failed to go into.
"BY THE COURT: Deny both defense motions."
L.P. was asked the following question on his questionnaire: "Has there been domestic violence in your family?" He responded, "No." He was also asked, "Have you ever been arrested?" He responded, "Yes." He was also instructed: "If yes was marked on the above question, on what charge?" He responded, "Assault but charge was dismissed."
This issue is somewhat analogous to the issue whether a juror has failed to respond or has responded untruthfully to a question posed on voir dire, despite the fact that the juror is not under oath when he is answering questions on a jury questionnaire. We find the following relevant:
 " 'Although the defendant has a right to have questions answered truthfully on voir dire examination of the venire, the failure of a juror to make a proper response to a question regarding his qualifications to serve as a juror does not automatically entitle the defendant to a new trial. The proper inquiry is whether the defendant's rights were prejudiced by the juror's failure to properly and correctly respond.'
 "Limbaugh v. State, 581 So.2d 5, 8 (Ala.Crim.App. 1991). Furthermore, the Supreme Court of Alabama has determined that whether a party is prejudiced by the failure of a juror to answer on voir dire is 'a matter primarily within the discretion of the trial court. In the absence of a showing of an abuse of discretion, the ruling of the trial court thereon will not be reversed.' Land Associates, Inc. v. Simmons, 562 So.2d 140, 148 (Ala. 1989), cert. denied, General American Life Ins. Co. v. Simmons, 499 U.S. 918, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991)."
Long v. State, 621 So.2d 383, 387 (Ala.Cr.App. 1993).
In this case, there was absolutely no evidence presented that the appellant's rights were prejudiced in any manner by L.P.'s serving on the jury. Nothing was presented *Page 1272 
to the trial court to indicate that the juror falsely answered the questions asked on the questionnaire. L.P. stated in his juror questionnaire that he had previously been charged with assault, but that the charges had been dismissed. The appellant was thus on notice that L.P. had been charged with an assault, and if she was concerned about the charge, she should have pursued the matter on voir dire. The trial court could not presume from L.P.'s answers on the questionnaire that he physically abused his wife, nor can we.
The trial court did not abuse its discretion in denying the motion for a mistrial; indeed, it would have been improper to grant the motion based upon such unsubstantiated assertions. Likewise, we find no abuse of the trial court's discretion in denying the appellant's motion to designate L.P. an alternate juror.
The appellant's contentions are without merit.
 III.
The appellant contends that the trial court erred in failing to require codefendant Kendall Pinyan to answer certain questions asked of him by defense counsel, and in permitting him to assert his Fifth Amendment privilege against self-incrimination. She argues in her brief to this court that she is entitled to "compulsory process which includes testimony by witnesses that would not be incriminating to the witness." She subpoenaed Pinyan and called him to the witness stand to testify. Pinyan appeared with his attorney, and after being sworn, asserted his privilege against self-incrimination through his counsel as to every question asked. The record shows the following:
 "Q. BY MR. LUKER [defense counsel]: State your name please.
 "BY MR. DEMPSEY [Pinyan's counsel]: Your Honor, I'm . . . representing Mr. Pinyan. He is invoking his Fifth Amendment privilege, and respectfully declines to answer.
 "BY MR. LUKER: Not even his name, Your Honor? Could we let the record reflect that we issued a subpoena for Mr. Pinyan and he has been retrieved from the place he is being held and brought to the court and this is in fact, Mr. Pinyan?
"BY THE COURT: This is in fact, Mr. Pinyan.
 "Q. [BY MR. LUKER]: Mr. Pinyan, did you kill Donny Talley?
 "BY MR. DEMPSEY: Your Honor, may it please the court, again Mr. Pinyan invokes his Fifth Amendment rights and respectfully declines to answer.
 "Q. [BY MR. LUKER]: Mr. Pinyan, isn't it a fact that you planned the killing of Donny Talley; also?
"BY MR. DEMPSEY: The same response, Your Honor.
 "BY THE COURT: Does Mr. Pinyan expect to take the Fifth Amendment to every question he is asked?
"BY MR. DEMPSEY: That's correct, Your Honor.
 "BY MR. LUKER: Your Honor, I have a couple more I'll ask him.
 "Q. [BY MR. LUKER]: Isn't it a fact, that you planned this killing and told Kay [the appellant] how to answer the police's questions?
"BY MR. DEMPSEY: The same response, Your Honor.
 "Q. [BY MR. LUKER]: Did you destroy the gun and the wallet?
"BY MR. DEMPSEY: Again, the same, Your Honor.
 "Q. [BY MR. LUKER]: That you told Kay to lie to the police?
 "BY MR. DEMPSEY: Your Honor, again, he respectfully declines to answer.
 "Q. [BY MR. LUKER]: That you have had police training and have been a police officer?
 "BY MR. DEMPSEY: Your Honor, again he declines to answer.
"BY MR. LUKER: One last question, Your Honor.
 "Q. [BY MR. LUKER]: Isn't it a fact that you are taking the Fifth Amendment to protect yourself, right now?
 "BY MR. DEMPSEY: Your Honor, he respectfully declines to answer. *Page 1273 
 "BY MR. LUKER: No further questions, Your Honor. This witness is not going to answer anything, it's obvious.
"BY THE COURT: Thank you."
The state contends that this issue is procedurally barred from review because the appellant made no objection to its actions in the trial court in reference to this witness and there was no adverse ruling. We agree. It is well settled that only matters timely raised in the trial court and as to which the rulings are adverse are preserved for appellate review.Glover v. State, 599 So.2d 79 (Ala.Cr.App. 1992). A reading of the record reveals that the appellant did not preserve this issue for review. Her failure to timely object to the proceedings indicates acquiescence in what occurred.
 IV.
The appellant contends that the trial court erred in denying her motion for a mistrial or in not giving curative instructions upon request after the prosecutor persisted in continuing to cross-examine her as to certain matters after the court cautioned him not to do so. She argues that the prosecutor's questions sought matters that had no probative value and were intended to inflame the jury. The record shows the following:
 "Q. [Defense counsel]: . . . Have you ever done any business with Zales Jewelry store?
"A. [The appellant]: Yes, I believe. Yeah.
"Q. What kind of business did you do with Zales?
 "A. Donny and I went there to fill out a credit application because of the boy's, who he played basketball with, girlfriend worked there and the more applications that you get, she would get a bonus or something.
"Q. Did you ever buy anything there?
 "A. I don't remember if I did — I can't remember if I did or not.
 "Q. Did you buy the cross you've worn all week there?
"A. No. This was given to me.
"Q. Who gave it to you?
"A. A friend of mine.
"Q. Who?
"A. Greg.
"Q. Who is Greg?
"A. A boy I knew. He sent it to me.
 "Q. Greg. Greg. Let me guess. Let me guess, Angela — Could it be Greg Hunt?
"A. Yes, it is.
"Q. Greg Hunt, who is on death row right now?
"A. Yes, sir.
"Q. Greg Hunt, who I prosecuted —
 "BY MR. LUKER [defense counsel]: Your Honor, I object.
"BY THE COURT: Sustained.
"Q. Well —
 "A. He is a minister down there and he sent it to me.
 "Q. He's a minister down there. He's gonna preach and you're gonna sing?
"BY MR. LUKER: Your Honor, I object.
"BY THE COURT: No more. Let's get off that.
 "Q. Well, let me ask you this: I think this goes to the state of mind and antisocial behavior and I will be prepared to offer psychological testimony through an expert. Did you fall in love with Greg Hunt?
"A. No.
 "BY MR. BRAMER [defense counsel]: Your Honor, I object and move for a mistrial.
"BY THE COURT: Sustained.
 "BY MR. BAKER [prosecutor]: Judge, may I approach the bench?
"(Bench conference out of hearing of jury.)
 "BY MR. BAKER: In my meeting with Dr. Brille in Colorado Springs, Colorado, I related to her that this woman may have had love or sex liaisons while in jail. She told me, Dr. Brille, that she considered that very important because it could affect her diagnosis as antisocial behavior. And, as an officer of the court, I proffer that happened and it happened in the presence of Mr. Wiersman, at dinner, with Dr. Brille. *Page 1274 
 "BY MR. BRAMER: Your Honor, I think the mistrial motion has already been granted.
"BY THE COURT: No.
 "BY MR. BRAMER: You granted the motion for a mistrial?
"BY THE COURT: No.
 "BY MR. BRAMER: He has brought up someone who has nothing to do with this case. He is offering information a psychologist may be able to use. That particular psychologist is not here, has not evaluated this client. Any information that went to this was objected to and sustain[ed] and was objected to, the second time, and sustained. And, he continues to go into something that —
"BY THE COURT: What do you expect to ask her?
 BY MR. BAKER: I want to ask her if she is in love with Greg Hunt.
"BY MR. BRAMER: It's immaterial and irrelevant.
 "BY MR. BAKER: They are offering testimony in the nature of psychological testimony on battered wife syndrome. It's important to show her characteristics; if she falls in love with men at the drop of a hat.
"BY THE COURT: One question.
 "BY MR. BRAMER: I made an objection and moved for a mistrial. I believe you said it was granted.
"BY THE COURT: It's denied.
"BY MR. BRAMER: We renew —
"BY THE COURT: Denied. Go ahead.
"Q. Are you in love with Greg Hunt?
"A. No, I'm not.
"Q. Have you communicated with him by letter?
"BY MR. BRAMER: Your Honor, I object.
"BY THE COURT: Sustained.
 "BY MR. BRAMER: I would like the jury to be given curative instructions regarding this line of questioning.
"BY THE COURT: Denied. Move to another —
 "Q. Do you have any other jewelry on that any other inmate has given you?
 "BY MR. BRAMER: Your Honor, I object. Same line of questioning.
"BY THE COURT: Sustained.
"Q. Have any other men given you any jewelry?
"BY MR. BRAMER: Your Honor, I object. Relevancy.
"THE COURT: Overruled.
"Q. Have any other men given you any jewelry?
"A. Yeah.
"Q. Who?
"A. Greg.
 "Q. He gave you the cross of Jesus. What else has he given you?
"A. A ring.
"Q. What kind of ring?
"A. A birthstone ring.
"Q. You are big on birthstones; aren't you?
"A. No, I didn't tell him I wanted it.
"Q. What else has he given you?
"A. That's all.
"Q. Did you ever have sex with him?
"A. No, I did not.
"BY MR. BRAMER: Your Honor, I object.
"BY THE COURT: Overruled.
"Q. Did you ever have sex with Greg?
"A. No, I did not.
"Q. Ever intend to?
"A. No, I do not.
"Q. Any other men give you any jewelry?
"A. No.
 "Q. Did you talk with Greg about your testimony here today?
"A. No, I did not.
"Q. Did he coach you and tell you how to testify?
"A. No, he did not.
"Q. Did you ever meet with him alone in jail?
"A. No, I did not.
"Q. Did you ever talk to him?
"A. No, only one time. That's it. *Page 1275 
 "Q. You talked to him one time and he buy you crosses and birthstone rings?
"A. That was on the phone.
"Q. One conversation?
"A. Uh-huh, on the phone.
"Q. How did you communicate with him?
"A. Through the phone at the jail.
"Q. Wrote a letter?
"A. Yes, we write.
"BY MR. BRAMER: Your Honor, I object.
 "BY MR. BAKER: I'll move on. We'll get back to insurance.
 "Q. Okay. One other question on that. While you were accepting gifts from Greg Hunt, did you still love Donny?
"A. I still love Donny, now, yes.
 "Q. You still love Donny, now. Now, insurance. Now, you have told us you are not denying that you and Kendall Pinyan entered into an agreement that your husband would be killed?
"A. Right.
 "Q. How long before he was killed did you all start planning?
"A. Months before."
The appellant first complains of questions seeking to elicit information about her association in jail with a death row inmate named Greg Hunt. We note that she admitted the association in response to questions by the prosecutor before an objection was made. A defendant who does not object to a question until after it has already been asked and answered fails to preserve the issue for appellate review. Thompson v.State, 527 So.2d 777 (Ala.Cr.App. 1988). Thus, this issue relating to the appellant's association with Greg Hunt has not been preserved for our review.
After reviewing the entire cross-examination complained of, we conclude that the trial court was not in error in denying the motion for a mistrial and in refusing to give curative instructions. Most of the appellant's objections were sustained by the trial court, and some of the questions would fall within the realm of legitimate cross-examination. Even assuming that error was committed, in our opinion, it was harmless beyond a reasonable doubt. In our opinion, it did not injuriously affect a substantial right of the appellant, and had no bearing on the outcome of the case. Ala.R.App.P. 45. A mistrial is a drastic remedy to be used sparingly and only to prevent manifest injustice, and the decision whether to grant it rests within the sound discretion of the trial court. Inmin v. State,654 So.2d 86 (Ala.Cr.App. 1994). Clearly, under the circumstances here, even if error was conceded, a mistrial would have been too drastic a remedy and improper.
 V.
In the course of the trial of this case, defense counsel moved for a mistrial on the ground that the sheriff entered the room where the jurors were gathered during a break in the testimony and conversed with at least one of the jurors. The record reflects that the following occurred after the break:
 "BY THE COURT: (In the presence of the jury, only.) It has been called to my attention that possibly the Sheriff came in with you all during this break; is that correct? Was anything said? What was the purpose of his coming in here?
"BY JUROR: I thought he just opened the door.
 "BY THE COURT: Okay. The people who guard you all are only the bailiffs. Not, the sheriff's deputy. Only the ones sworn in as bailiffs which are Mr. Guthrie, Jim Wells, Wanda Lansford — If anyone else gets around you, run like they have the plague.
"But, nothing was said or anything?
 "BY THE JUROR: He mainly wanted to get us some ice.
"BY JUROR: He talked about soap operas —
 "BY THE COURT: Did you all actually carry on a conversation?
"BY JUROR: About watching soap operas.
"BY THE COURT: Nothing about the case?
"BY JURORS: No. *Page 1276 
 "BY THE COURT: We just need to make a record. Anything else? Thank you very much. We have to make records of everything of this magnitude.
"(Outside the presence of the jury.)
 "BY THE COURT: I've been requested to talk with one of the jurors to determine what was said when the Sheriff went in.
 "Mrs. Talley, does that meet with your approval, for me to talk with the juror outside your presence?
"BY MRS. TALLEY: Yes, sir.
"BY THE COURT: Okay.
". . . .
 "Q. [THE COURT]: What actually was said in there? This may appear to be making a big deal out of nothing. But, it has to be covered.
 "A. [THE JUROR]: One of the ladies asked for some ice. And, the sheriff went and got some ice and brought it back.
"Q. Was he in there when she asked?
 "A. I don't know. I just hear[d] her say, 'All I did was just ask for some ice.'
"Q. Okay.
"A. And, he got the ice.
 "Q. Okay. And, he said something about soap operas?
 "A. Yes. I don't know who it was that brought it up. Linda said something about she had not seen any soap operas in a long time. And, he said, 'I used to watch them but I haven't in a long time.' He said he got hooked on watching 'Days of Our Lives', at one time.
 "Q. There was no relationship of the soap operas with this case here?
"A. No, none whatsoever. There wasn't anything.
 "Q. Nothing was said that had any relationship to the case?
 "A. None. Nothing was said that had anything to do with the case.
 "Q. Nothing was said that in your opinion would affect a juror?
 "A. No, none whatsoever. I just thought he was being nice.
"Q. We can't even allow people to be nice."
Upon conclusion of the above testimony and further discussion between counsel and the trial court, the court denied the motion for mistrial. "Even though a trial court's ruling on a motion for a mistrial is reviewable on appeal, Stennett v.State, 340 So.2d 65 (Ala. 1976), rulings on mistrial motions are within the discretion of the trial court; they will not be reversed in the absence of a clear abuse of discretion." Exparte Jefferson, 473 So.2d 1110, 1114 (Ala. 1985), cert.denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986). We find no abuse of discretion here. The record supports the conclusion that the sheriff's actions and comments were not calculated to nor did they prejudice the defendant or influence the juror[s] in any way. This issue is without merit.
For the foregoing reasons, the judgment in this case is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986).