[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1126 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1127 
Halycon Ballard appeals from her conviction for second-degree theft, see § 13A-8-4, Ala. Code 1975. Ballard was tried before a jury on the charge that she had taken two blouses and a sweater from Robin O'Neal, a boutique in Mountain Brook, on June 8, 1996, without paying for them. Following a guilty verdict, the trial court adjudicated Ballard guilty and sentenced her to two years' imprisonment. It suspended the sentence, and placed her on supervised probation for two years. The trial court also ordered Ballard to pay $300 restitution and to pay $50 to the victims compensation fund. This appeal follows. We affirm.
The State's evidence tends to prove the following. On Saturday, June 8, 1996, Halycon Ballard entered the Robin O'Neal boutique, where she was assisted by Karen Hill, a sales clerk who had been employed at Robin O'Neal for three years. Ballard, who entered the store carrying a purse with a shoulder strap, expressed an interest in a blazer, and Ms. Hill assisted her in finding other clothes to coordinate with the blazer. Ballard took the blazer and several other items of clothing into a dressing room. Ballard came out of the dressing room carrying just the blazer. At this point, Ballard told Ms. Hill that she could not find her wallet; she left the store and went to her automobile in the parking lot. She was carrying her purse. Ms. Hill watched Ballard walk to her car, open the rear passenger side door and get in the car. Ms. Hill then returned to the sales counter. Ballard returned to the shop with her wallet in her hand. After trying on several sweaters, Ballard indicated that she would purchase only the blazer. She told Ms. Hill that she wanted to pay for the blazer, the total price of which, including tax, was $297, by charging $100 to her credit card and writing a personal check for the remaining $197. She gave Ms. Hill her credit card; Ms. Hill created a credit slip for $100, and Ballard wrote a personal check for $197. Ballard did not sign the credit slip. Ballard then informed Ms. Hill that she had lost her keys. Ballard, with the assistance of a store seamstress, returned to the dressing room, purportedly to look for her keys, but she did not find *Page 1128 
them. Then, after stopping to use the boutique's restroom, Ballard announced that she was late for an appointment with her hairstylist; she left the store with the blazer on a hanger, covered with a white plastic garment bag.
After Ballard left the store, Ms. Hill went to the dressing room to clean up and to retrieve the clothing Ballard had left in the room. Ms. Hill discovered that a beige sweater Ballard had taken into the dressing room was missing. She also found two hangers placed in some lamp wiring under a small table in the dressing room, hidden by the table covering. At that point, Ms. Hill left the store and approached Ballard's automobile, which was in the same parking space. As she approached Ballard's car, she saw two blouses that had been hanging on the same rack as the blazer Ballard purchased. The blouses were between the driver's seat and the door on the driver's side. She could see the Robin O'Neal price tags on the blouses. Ms. Hill returned to the store and took the seamstress back to the car to see the blouses. Robin O'Neal, the owner of the boutique, arrived around this time and they decided to call the police. Ms. Hill searched the shopping area, looking in different hair salons for Ballard; she found her in a nearby salon. When the police arrived, they were shown Ballard's car and the blouses, the invoice, the credit card slip, and the check for the blazer. The police approached Ballard in the hair salon and asked her what she had purchased in Robin O'Neal. She told them that she had purchased a blazer and two blouses and she showed them her checkbook ledger, in which she had recorded a $497 check payable to Robin O'Neal. After checking with the boutique, the police returned to the salon and confronted Ballard with the fact that the check she had presented to Robin O'Neal was for $197. Ballard then told police that she had taken the blouses on approval and that she had left an open credit slip with the store, which was to be used if she decided to keep the blouses. At this point, the police arrested Ballard. The police retrieved the blazer, which was hanging in the salon. When they removed the white plastic garment bag that covered the blazer, they discovered a sweater underneath the blazer on the same hanger.
The defense theory presented at trial was that Ballard had purchased the blazer and had taken the blouses "on approval" as had been the custom and practice of the Robin O'Neal boutique. According to witnesses, it was customary for the boutique to allow customers to take clothing home on approval, provided the customer left their credit card number with the sales clerk. For approvals, the boutique would customarily generate a sales invoice listing the items being taken along with their prices and write "approval" across the top of the invoice. The customer's credit card number would also be recorded on the invoice. If the customer later telephoned and indicated she wanted to buy the clothing, the boutique would then generate a credit slip and complete it on the customer's behalf. As to the sweater she was accused of taking, Ballard denied knowing that it was underneath the blazer. She testified that Ms. Hill had placed the blazer over a sweater while showing her accessories for the blazer, and that Ms. Hill must have forgotten to remove the sweater when she put the plastic garment bag over the blazer. Ballard testified that she left the boutique with the blazer on a hanger in the white plastic garment bag and with the two blouses in a white plastic bag. She said that she took the items to her car and that she took the blouses out of the bag so that she could put a magazine, a novel, and a water bottle in the bag to carry into the hair salon. She said that she took the blazer with her to show her hairstylist. Ballard testified that Ms. Hill must have accidentally left the sweater under the blazer and then mistakenly completed the credit slip for $100. Ballard argued that Ms. Hill, in order to cover those mistakes, fabricated a sales invoice that recorded only the purchase of the blazer and then *Page 1129 
falsely accused Ballard of stealing the blouses and sweater.
 I.
Ballard argues that the trial court improperly admitted what the prosecutor alleged was a fraudulent Robin O'Neal invoice Ballard's son gave to defense attorneys over a year after the incident. The invoice was offered by the prosecutor to show Ballard's consciousness of guilt. The invoice, purportedly a customer copy of a Robin O'Neal invoice dated June 8, 1996, appeared to corroborate Ballard's testimony that she had taken the blouses from Robin O'Neal on approval. The invoice listed the salesperson as "Karen" and had the misspelled name "Hallycon Ballard" along with a notation "jacket w/sweat." There was also a partially obliterated word, which appeared to be "blouse," written in the top section of the invoice and the word "approval" was written across the top. According to Ballard's son, Vance, he found the invoice, along with a white plastic bag and a Glamour magazine in late June, 1997, under a rear seat in the family's van as he was packing the van to return from a Georgia cheerleading camp. The van was driven principally by Ballard's husband, but Ballard had access to it and had driven it in the past. According to Vance Ballard, after he returned to Alabama, he and his father swapped telephone messages left on their answering machines regarding the invoice. Vance told his father that he had found the invoice and his father instructed him to turn the items he found in the van over to Ballard's attorneys. Vance Ballard complied with his father's instructions, and gave the items to the receptionist at the attorney's office. Vance Ballard stated that when he later told his mother about the invoice, she told him that she was glad he had found it, because she had been looking for it.
The State called forensics experts who testified that the invoice itself was not the type used by Robin O'Neal in June 1996, but appeared to be a Robin O'Neal invoice printed after 1996. The witnesses also testified that the handwriting on the invoice could have been, in part, a tracing of the actual June 8, 1996, invoice. Because the handwriting appeared "forced" or to be a tracing, the the forensics experts could not eliminate either Ballard or Karen Hill as the author of the invoice. The prosecutor did not present any evidence to the jury that Ballard had submitted the questioned invoice to the district attorney's office with the intent to introduce the invoice at trial to corroborate her testimony.
Ballard argues that there was insufficient evidence to connect the invoice to her and that it should not have been admitted as tending to show her consciousness of guilt. She argues that she did not find the document; that it was not found in her automobile, but in a family van driven principally by her husband and very rarely by her; and that she was not the person who turned the document over to defense counsel. Ballard also argues that there was no evidence to suggest that she directed that the document be turned over to defense counsel; that there was no evidence that she ever saw the document before it was turned over to defense counsel; that she never spoke to her son about the invoice before he found the invoice; and that there was no evidence that Vance Ballard used the family van on the occasion when he found the questioned invoice at her suggestion.
 "`[E]vidence [admitted to show a consciousness of guilt] never depends on its contemporaneousness, connection with the crime that is charged, or upon its being a part of the res gestae. Facts showing or tending to show a consciousness of guilt are always permissible, though not connected with the res gestae of the offense. Any statement or conduct of a person indicating a consciousness of guilt, where at the time or thereafter he is charged with or suspected of the crime, is admissible as a circumstance against him on his trial. *Page 1130 
Evidence of circumstances, which are part of a person's behavior subsequent to an event which it is alleged or suspected he is connected with or implicated in, [is] relevant, if the circumstances are such as would be natural and usual; the connection or implication having been shown to exist.' . . . Montgomery v. State, 17 Ala. App. 469, 86 So. 132, 134 (1920), cert. denied, Ex parte State, 204 Ala. 389, 85 So. 785 (1920)."
Chisler v. State, 553 So.2d 654, 666 (Ala.Cr.App. 1989).
Whenever a person is on trial for a criminal offense, evidence of the defendant's post-crime conduct that may fairly be inferred to have been influenced by the criminal act is admissible. The post-crime conduct of the defendant shows his or her state of mind which has been characterized by our courts as consciousness of guilt, and may be admitted as circumstantial evidence of guilt. Conley v. State, 354 So.2d 1172, 1179 (Ala.Cr.App. 1977). When post-crime conduct is introduced as circumstantial evidence of a defendant's guilt, there must be a link between the defendant and the evidence. See Stewart v. State, 398 So.2d 369, 375
(Ala.Cr.App.), cert. denied, 398 So.2d 376 (Ala. 1981); See C. Gamble, McElroy's Alabama Evidence, § 190.03 (5th ed. 1996). Generally, evidence is relevant if it has "any tendency" to prove or disprove a fact of consequence to the action. Rule 401, Ala.R.Evid. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, Ala.R.Evid.
"It is well settled that `a determination of admissibility of evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of an abuse of discretion.'" State v. Mason, 675 So.2d 1, 3 (Ala.Cr.App. 1993), quoting Jennings v. State, 513 So.2d 91, 95 (Ala.Cr.App. 1987). Having carefully reviewed the evidence before the trial court when the questioned invoice was admitted into evidence, we believe the trial court correctly admitted that invoice as evidence tending to prove Ballard's consciousness of guilt. The existence of what appeared to be a fraudulent invoice found in the Ballard family van that corroborated Ballard's testimony is certainly relevant as tending to show her consciousness of guilt. While there was no direct evidence indicating that Ballard created, or helped to create, the questioned invoice, Ballard was the only person who would have benefited from its discovery. See United States v. Bright, 630 F.2d 804, 821 (5th Cir. 1980), citing United States v. Hoffa, 349 F.2d 20, 45 (6th Cir. 1965), aff'd,385 U.S. 293 (1966). Her son produced the invoice over a year after the incident; he testified that he found it in a family vehicle to which Ballard had access. Forensic testing could not eliminate Ballard as the possible author of the questioned invoice.
There is little Alabama caselaw on the degree of evidence necessary to link a defendant to fabricated evidence before that evidence is admissible as tending to show consciousness of guilt. Nonetheless, we find, as did the Alabama Supreme Court over a century ago, that when there is some connection between post-crime conduct and the defendant, and the probative value of the evidence is not outweighed by the danger of unfair prejudice, the question should be one of the weight given the evidence by the jury, not one of admissibility.
 "Any indications of a consciousness of guilt by a person suspected of or charged with crime, or who may after such indications be suspected or charged, are admissible evidence against him. The number of such indications it is impossible to limit, nor can their nature or character be defined. Presumptions or inferences may be, and often are, founded on circumstances which, of themselves, independent of the accusation, would not be ground of crimination. It is largely a question of fact, rather than a question of law, for the determination *Page 1131 
of the jury, whether particular conduct, or particular expressions of the accused, refer to a criminal offense, and spring from his consciousness of guilt. When it is clear that they have no relation to the offense, and that they ought not to have any influence with the jury, it is the duty of the court to reject them as evidence. But however minute or insignificant they may be, shedding but a dim light upon the transaction, if they have a tendency to elucidate it, they must be admitted. They may be connected with other circumstances which will constitute a chain of evidence, leading the mind to a satisfactory conclusion."
MacAdory v. State, 62 Ala. 154, 159-60 (1878).
We hold that the questioned invoice found in the Ballard family vehicle, which, had it not been fraudulent, would have corroborated Ballard's version of the events, was sufficiently connected to Ballard to allow the jury to consider whether it tended to show a consciousness of guilt. The probative value of the questioned invoice outweighed the danger of unfair prejudice and the trial court properly admitted it as evidence of Ballard's consciousness of guilt.
However, even if we had not found the questioned invoice to be admissible as tending to show consciousness of guilt, we would still find the trial court's admission of the invoice to be harmless error.
 "[W]hen, after considering the record as a whole, the reviewing court is convinced that the jury's verdict was based on the overwhelming evidence of guilt and was not based on any prejudice that might have been engendered by the improperly admitted [evidence], the admission of such [evidence] is harmless error.
"Rule 45, Ala.R.App.P., states:
 "`No judgment may be reversed or set aside, nor a new trial granted in any . . . criminal case on the ground of . . . the improper admission . . . of evidence, . . . unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.'
". . . .
 "In determining whether the admission of improper testimony is reversible error, this Court has stated that the reviewing court must determine whether the `improper admission of the evidence . . . might have adversely affected the defendant's right to a fair trial,' and before the reviewing court can affirm a judgment based upon the `harmless error' rule, that court must find conclusively that the trial court's error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant."
Ex parte Crymes, 630 So.2d 125, 126 (Ala. 1993) (emphasis omitted).
This is not a case in which the State relied principally on the evidence of the questioned invoice to persuade the jury of Ballard's guilt, even though the State called several witnesses to establish that the invoice was fraudulent. Indeed, there were eyewitnesses as well as physical evidence that tended to prove that Ballard took the sweater and the blouses from the boutique and that she did not intend to pay for them. Both the store sales clerk and the seamstress watched Ballard buy one blazer and leave the store with only the hanging bag containing that blazer. Both witnesses saw the two blouses with Robin O'Neal price tags in Ballard's locked automobile, placed between the driver's seat and the car door; they were not in a bag. Shortly after the theft, the police also saw the blouses in Ballard's locked automobile and obtained a copy of a Robin O'Neal invoice, which indicated that Ballard had purchased only a blazer, and that the total price of the blazer was $297. When asked about her purchases at Robin O'Neal, Ballard *Page 1132 
told the police that she had purchased the blazer and two blouses and she showed the police her checkbook ledger, which contained an entry showing a $497 check written to Robin O'Neal on that day. The evidence clearly showed that Ballard had written a check payable to Robin O'Neal for only $197. According to the police witness, Ballard never claimed that she had taken the blouses from Robin O'Neal "on approval" until she was challenged by police about the amount of the check she said she had written. The combination of the testimonies of the store sales clerk and the store seamstress, the two blouses found in Ballard's locked automobile between the driver's seat and door, the sweater subsequently found underneath, and on the same hanger as, the blazer, and the conflicting stories Ballard told police when confronted about her purchases created evidence of Ballard's guilt beyond a reasonable doubt.
 II.
Ballard argues that the trial judge erred in denying a motion for a mistrial after the prosecutor, in redirect examination, asked Dr. Richard Roper, a forensics expert witness for the State, whether Ballard could have contacted Lamar Miller, his former supervisor, to examine the questioned invoice. Ballard argues that the prosecutor's question, which was objected to before Dr. Roper could answer, amounted to an impermissible comment on her failure to call a witness equally available to both sides.
The record reflects that the State called Dr. Roper, the laboratory director of the Montgomery regional laboratory of the Alabama Department of Forensic Sciences, as an expert on questioned documents and a handwriting expert. On cross-examination, Ballard questioned Dr. Roper's qualifications, pointing out that he had a doctorate in zoology, that his minor area of study was in physiology and botany, and that his academic studies had had nothing to do with the examination of questioned documents. After determining that, at one time, Dr. Roper's areas of responsibility in the Alabama Department of Forensic Sciences included performing autopsies, the defense counsel continued questioning:
 "Q [Defense counsel]: And at some time you decided you were going to be a document examiner?
 "A: It was decided that I was going to change. I chose to go into documents, yes, sir.
 "Q: Now, you have been doing the document examination, I think you said, since 1981?
"A: As a case reporting scientist, yes, sir.
 "Q: Now, there is no licensing board for the State of Alabama for document examiners, is there?
"A: No, sir.
 "Q: But there is a national certification board for document examiners, isn't there, Dr. Roper?
"A: Yes, sir, there is.
 "Q: That's the American Board of Forensic Document Examiners?
"A: That's correct.
"Q: And you are not certified, are you?
"A: Not at this time, no, sir.
"Q: How long have you been trying to be certified?
 "A: I have not applied. I have made several attempts to prepare, which I have not been able to adequately, in my mind, prepare myself to take the test. So I have decided to postpone it until I retire.
"Q: Who is your predecessor in your job?
"A: Mr. Lamar Miller.
 "Q: And Mr. Lamar Miller was certified by the national board, wasn't he?
"A: That's correct."
(R. 778-80.) After those questions, defense counsel asked Dr. Roper about the qualifications for board certification, emphasizing that one of the qualifications he *Page 1133 
was not able to fulfill was a full-time devotion to documents examination.
In redirect examination, the prosecutor began asking about Mr. Miller:
 "Q [Prosecutor]: Mr. Clark asked you about Lamar Miller, your supervisor and the person who trained you.
"A: Yes, ma'am.
"Q: Do you recall that?
"A: Yes, ma'am.
 "Q: And I believe you indicated that he is certified by the only board of forensic document examiners, the only recognized professional organization of document examiners.
"A: That's correct.
"Q: And you are not certified by that board.
"A: Correct.
"Q: Do you still keep in touch with Lamar Miller?
"A: Yes, ma'am.
 "Q: And he is now retired from the Department of Forensic Sciences; is that correct?
"A: He's retired into private practice, yes, ma'am.
"Q: He does that on a private basis?
"A: Yes, ma'am.
 "Q: The defense in this case then could have contacted Lamar Miller to have him examine the questioned document just as you did?
 "MR. CLARK [Defense counsel]: If it please the court, we would object. Just a minute —
". . . (Words between prosecutor and defense counsel.)
 "THE COURT: Wait a minute. We'll take it up later. Go on to some other thing."
(R. 865-66.) The prosecutor changed the subject of her redirect examination and continued. After Dr. Roper's examination was completed, defense counsel made the following motion outside the presence of the jury:
 "MR. CLARK: If it please the Court, . . . we would respectfully move the Court for a mistrial based upon what we consider to be the intentional act of the prosecutor to provoke a mistrial in that she asked in the presence of the jury questions about — `Well, the defense could have called Lamar Miller' — I think she said — `as an expert.' That is a direct comment on whether the defense calls witnesses or actions that the defense might take, which is absolutely in violation of both the federal and state constitutions. And I believe that Ms. Salter knows that. Having done that intentionally, we would respectfully move the Court for a mistrial."
(R. 874-75.) The prosecutor responded that defense counsel had opened the door for such questioning when he attacked Dr. Roper's qualifications and compared Dr. Roper's failure to become board certified with Lamar Miller's board certification. The trial judge denied the motion. Defense counsel never asked the court for a curative instruction.
Ballard argues that the prosecutor violated the rule that "one party may not comment unfavorably on the other party's failure to produce a witness supposedly unfavorable to that party if the witness is equally available to both sides." Hunt v. State,453 So.2d 1083, 1087 (Ala.Cr.App. 1984).
 "`Availability' is determined first by testing the other party's superior knowledge of the existence and identity of the absent witness; second, by the question of whether the relationship between the absent witness and the other party would reasonably be expected to bias the witness's testimony toward the other party."
Davis v. State, 494 So.2d 851, 856 (Ala.Cr.App. 1986).
Our review of the record shows that, while Ballard was aware of the existence and identity of Lamar Miller, there is absolutely *Page 1134 
no evidence that there was any relationship between Mr. Miller and Ballard or the State so that Mr. Miller could reasonably be identified as an uncalled witness. In fact, it is clear from the record that Lamar Miller was totally unconnected to this case and his name and credentials were only put before the jury by Ballard in order to compare Dr. Roper's qualifications with Mr. Miller's. Because there is no evidence in the record from which we can conclude that Lamar Miller was an uncalled witness equally available to both sides, we cannot conclude that the prosecutor's invocation of his name was an improper comment amounting to error. Hunt v. State, supra. Because there was no fundamental error warranting a mistrial, the trial court properly denied Ballard's motion for a mistrial. McArthur v. State, 591 So.2d 135, 140
(Ala.Cr.App. 1991).
 III.
Ballard next argues that the trial court erred in overruling her objection that the prosecutor, during closing argument, argued facts not in evidence. Specifically, Ballard argues that the prosecutor incorrectly argued that the defense was provided with a copy of the June 8th invoice from the Robin O'Neal boutique which recorded Ballard's purchase of the blazer, marked as State's exhibits 1A and 1B. The State responds that the prosecutor's argument was a permissible reply in kind to Ballard's closing argument, and that it was, therefore, permissible argument.
The record reflects that defense counsel, arguing that Karen Hill, the sales clerk, was the author of the questioned invoice, made the following argument:
 "Now, before we leave Dr. Roper, you know, Dr. Roper testified that one of these — this torn invoice [the questioned invoice] and the other invoice dated June 8, 1996 — one might be a tracing of the other. One might be a tracing of the other if the State's position is that somehow or another the torn invoice was traced from the June 8, 1996, invoice.
 "Robin O'Neal's folks testified that they had State's 1A and State's 1B. They had those. Did Karen Hill trace it or did Karen Hill simply write this State's Exhibit 25 [the questioned invoice]?"
(R. 1414-15.)
During the State's closing argument, the prosecutor commented on defense counsel's argument:
 "MS. GWINN [Prosecutor]: And one other thing that Mr. Clark doesn't want you to know and which he argued to you was that the State and Robin O'Neal [have] had these documents in their possession, leaving you with the inference that, `How could [Ballard] have traced them when she didn't have them?' Well, you will notice that State's exhibit sticker on this document is over another sticker. It's over a defendant's exhibit sticker.
 "MR. CLARK [Defense counsel]: If it please the court, we would object. There is no evidence in the case to that effect. This is improper argument. It is not based on the facts in evidence. That's absolutely improper.
"THE COURT: Overruled. Go ahead.
 "MS. GWINN: He knows that because he made sure to put it there.
 "MR. CLARK: If it please the court, again we would object. That's not proper argument, if it please the court.
"THE COURT: Overruled.
 "MS. GWINN: And he knows that they had a copy of this document because it was provided to them by the State at that hearing that he talked to you so much about where Karen Hill testified.
 "MR. CLARK: If it please the court, again there is no evidence in the case to support that statement. And the prosecutor is not permitted to argue things that are not in evidence.
"THE COURT: Overruled. *Page 1135 
 "MS. GWINN: Just a month after this whole incident came up and a year before [the questioned invoice] ever came to light, they had a copy of [the June 8th store invoice] in their possession, and Mr. Clark knows that."
(R. 1438-40.)
Before the arguments of counsel, the trial court instructed the jury as follows:
 "We are about to have final summations made by both sides. The State will go first and then the defendant. And then the State has the opportunity for the last argument or rebuttal argument since they have the burden of proof in this area. Keep in mind their arguments or remarks are not evidence in this case. The only evidence you heard came from this [witness] stand from the witnesses who gave testimony or from any of the exhibits I have admitted for your consideration as evidence. You are the judges of the evidence in this case, ladies and gentlemen."
(R. 1339-40.)
 "The prosecutor's statements are not evidence. Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App. 1984), cert. denied, 468 So.2d 902 (Ala. 1985). Further, prosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Cr.App. 1982). `Statements of counsel in argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict.' Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984)."
Armstrong v. State, 516 So.2d 806, 809 (Ala.Cr.App. 1986).
 "The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Cr.App.), cert. denied, 340 So.2d 1140 (Ala. 1976). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Cr.App.), cert. denied, 361 So.2d 1152
(Ala. 1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634
(Ala.Cr.App. 1979); McQueen v. State, 355 So.2d 407
(Ala.Cr.App. 1978)."
Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App. 1980), writ denied, 398 So.2d 332 (Ala. 1981), cert. denied, 355 U.S. 941
(1981). A prosecutor has a right to reply in kind to the argument of defense counsel. This "reply-in-kind" doctrine is based on fundamental fairness. See Ex parte Rutledge, 482 So.2d 1262, 1264
(Ala. 1984).
A review of the record indicates that the prosecutor's comments regarding Ballard's access to the original June 8th invoice which showed the purchase of the blazer were a reply in kind to the inferences raised by the defense in its argument that Ballard did not have access to the original invoice and that, therefore, she could not have created the questioned invoice because she did not have the original invoice from which to trace. The argument that the defense had a copy of the invoice introduced as State's exhibits 1A and 1B was properly based on an inference raised by the multiple exhibit stickers on the exhibits. Because the State exhibit stickers had clearly been placed over defense exhibit stickers on those exhibits, the prosecutor was allowed to argue, as a reply in kind, that the defense must have had copies of those exhibits. However, the prosecutor should not have been allowed to expand on the reply-in-kind argument and inform the jury that the State had provided Ballard with a copy of the original invoice at the preliminary hearing a month after the incident. When the prosecutor expanded that argument beyond the permissible inferences and began informing the jury about the facts of when and where *Page 1136 
the State had provided Ballard with a copy of the invoice, she improperly became a witness for the State. While counsel should have wide latitude in arguing reasonable inferences from the evidence, counsel cannot argue as a fact something not supported by the evidence presented during trial. Brown v. State,374 So.2d 391 (Ala.Cr.App.), aff'd, 374 So.2d 395 (Ala. 1979). However, although the prosecutor argued facts not in evidence, not every such argument is so prejudicial as to require a reversal. See Brown v. State, at 396.
 "In order for unsupported prosecutorial statements of fact to require reversal, the objectionable statements must be (1) made as of fact, (2) without support by any evidence, (3) pertinent to the issues, and (4) have a natural tendency to influence the finding of the jury. Tillman v. State, 374 So.2d 922 (Ala.Cr.App. 1978), cert. quashed, 374 So.2d 926, 927 (Ala. 1979); Flint [v. State, 370 So.2d 332 (Ala.Cr.App. 1979)]."
Jones v. State, 456 So.2d 366, 374-75 (Ala.Cr.App. 1983), aff'd,456 So.2d 380 (Ala. 1984), cert. denied, 470 U.S. 1062 (1985).
The prosecutor's argument as to when and where Ballard received a copy of the original June 8th invoice was clearly phrased as a statement of fact, and was not merely an inference drawn from the facts. However, the argument was only tangentially pertinent to the issues: it responded only to those arguments concerning evidence that Ballard was the creator of the questioned invoice being offered as proof of her consciousness of guilt. As noted above, there was other admissible evidence from which the prosecutor could argue by inference that Ballard did have access to the original June 8th invoice. Most importantly, however, our review of the evidence shows that the prosecution did not depend on the evidence relating to the questioned invoice to prove Ballard's guilt. As we noted earlier in this opinion, the State's eyewitnesses and testimony from police officers presented overwhelming evidence of Ballard's guilt. Likewise, the crucial evidence as to Ballard's initial story to police that she had purchased the blouses and her offering police, as proof of her purchases, her checkbook ledger, which indicated she had written a check payable to Robin O'Neal for $497 was the primary evidence of her consciousness of guilt, especially because Ballard never proffered the theory that she had taken the clothes on approval until the police challenged her story when they confronted her with her check clearly written for only $197.
In light of the overwhelming evidence against Ballard, we do not view the prosecutor's arguing facts not in evidence as having a natural tendency to so influence the jury against Ballard as to have denied her a fair trial. The prosecutor's argument as to when and where the State gave copies of the original invoice to the defense was not so prejudicial as to have necessarily affected the substantial rights of the appellant. We do not believe the prosecutor's argument amounted to reversible error. Jones v. State, at 376.
 IV.
Ballard argues that the trial court erred when it overruled her objections, denied her motion for a mistrial, and did not give a curative instruction when the prosecutor cross-examined her on the contents of defense attorney's opening statement and, according to Ballard, elicited privileged communications between her and her attorney.
The record reflects that Ballard's husband testified that when he took a spare set of car keys to Ballard at the hair salon on June 8, 1996, she told him that she had remembered she had a spare magnetic key attached to her car, but that she had already telephoned him to bring her the spare key by the time she remembered the other key. (R. 932-33.) Ballard testified that she did not recall saying anything to *Page 1137 
her husband about the spare key when he arrived at the hair salon. (R. 1001.) On cross-examination, the prosecutor asked Ballard about this discrepancy between her testimony and her husband's testimony:
 "Q: When is it that you told your husband your mistake in getting him to come down there with the spare set of keys when you already had one?
"A: I don't remember telling him that.
"Q: Well, you heard him say that you did.
"A: Yes, I heard him say that.
 "Q: You heard your lawyer in his opening statement say that you realized that you had the spare key; but because you had bothered him and gotten him to come down, you never told him that. Did you hear him say that?
"A: I don't remember what I heard my lawyer say.
 "Q: You don't remember what he said in this courtroom just a few days ago?
 "MR. CLARK [Defense counsel]: If it please the court, we would object. That's argumentative.
"THE COURT: Overruled.
 "MR. CLARK: And irrelevant whether she remembers what I said a few days ago.
"THE COURT: Overruled.
"A: No, I don't remember all of the opening statements.
 "Q: You don't remember what he said about your spare key that was magnetically attached to your state car in his opening statement and how that was different from what your husband testified about that magnetic car key?
 "MR. CLARK: If it please the Court, we would object. That's argumentative and it is a confusing question.
"THE COURT: Overruled.
"A: No, I just don't recall that.
 "Q: The only reason what Mr. Clark said is different from what your husband testified about is because you are the one [who] told Mr. Clark what actually happened and you told him that you purposefully didn't mention to your husband this spare key.
 "MR. CLARK: If it please the court, we object. Counsel knows that's improper. And we would have a motion to make.
"THE COURT: I sustain the objection.
 "MS. GWINN [Prosecutor]: Your Honor, it certainly can't be a confidential communication if it is something he said in open court.
"THE COURT: I sustain the objection.
 "MR. CLARK: "If it please the court, what I said in open court could have been what Mr. Ballard told me.
"THE COURT: I sustained the objection, Mr. Clark.
 "MR. CLARK: And we would renew our motion, which we made at the appropriate time.
". . . .
 "Q: Have you ever told anybody that, on purpose, you didn't tell [your husband] about the spare car key because you realized the trouble that you had caused him in getting him to come down there?
 "MR. CLARK: If it please the court, we would object to whether she has told anybody. She knows that what she may have told counsel is not subject. It's an improper question.
"THE COURT: Overruled. You can answer it.
"A: I could have told Mr. Clark that.
 "Q: So, you told him one thing and you are telling us something different?
 "MR. CLARK: If it please the court, we would object. And again, that's argumentative. It's an improper question.
"THE COURT: Overruled.
"A: No, ma'am.
". . . .
 Q: Maybe my question wasn't clear. Let me try again. If you told Mr. Clark one thing about that key — that, on purpose, you neglected to tell your husband *Page 1138 
that you remembered you had that spare key because you had already caused him the trouble of coming there — and now you are telling us something different, that, in fact, you just don't remember — those would be two different things, wouldn't they?
 "MR. CLARK: If it please the court, we would object. That's argumentative, what she told counsel.
"THE COURT: I'll sustain."
(R. 1134-40.) Only at the end of this cross-examination, while the jury was taking its morning recess, did defense counsel make a motion for a mistrial based on the prosecutor's eliciting privileged communications between Ballard and her counsel. The trial court denied the motion for a mistrial.
In her brief to this court, Ballard argues that the trial court erred in allowing the prosecutor to ask questions concerning defense counsel's opening statement. However, because defense counsel objected to those questions only on the ground that they were "argumentative" and "confusing," this issue was not properly preserved for appeal. A specific objection by defense counsel is necessary to preserve error for appellate review. Reeves v. State,456 So.2d 1156 (Ala.Cr.App. 1984). The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not specified at trial. Moss v. State, 545 So.2d 230, 231 (Ala.Cr.App. 1989). Likewise, when the prosecutor asked Ballard what she had told her attorney about the car keys, defense counsel objected to the question only as "improper." Defense counsel never set out an objection to the question based on the ground that it violated confidential attorney/client communications until the end of the cross-examination, when he made his motion for a mistrial. A motion for a mistrial made at the conclusion of a witness's testimony does not preserve for review the issue whether the witness's answer, which came in without a contemporaneous specific objection or a motion to strike, should have been admitted. Robinson v. State, 584 So.2d 533 (Ala.Cr.App. 1991).
However, even if the issue regarding the propriety of the prosecutor's eliciting confidential attorney/client communications was preserved for our review, we would hold that the trial court did not abuse its discretion in denying the motion for a mistrial. The objection to the prosecutor's question regarding whether Ballard told her lawyer one version of the "car key" episode was immediately sustained. Because Ballard did not answer, there was no need for the trial court to determine whether the answer would have divulged a confidential communication between her and her counsel. See Harris v. State, 281 Ala. 622, 625, 206 So.2d 868,871 (Ala. 1968). We agree with the State that Ballard's subsequent testimony that she may have told her lawyer about the car-key episode was a nonresponsive answer to a proper question.
"A mistrial is a drastic remedy to be used sparingly and only to prevent manifest injustice, and the decision whether to grant it rests within the sound discretion of the trial court." Talley v. State, 687 So.2d 1261, 1275 (Ala.Cr.App. 1996), citing Inmin v. State, 654 So.2d 86 (Ala.Cr.App. 1994). From our review of the record, we cannot say that the trial court abused its discretion in denying Ballard's motion for a mistrial.
 V.
Ballard argues that the trial court erred by overruling her objections, denying her motion for a mistrial, and failing to give a curative instruction when, she argues, the prosecutor cross-examination of her was improper and improperly impeached her on a collateral matter. Specifically, Ballard argues that the trial court erred when it allowed the prosecutor to call a witness to impeach Ballard's testimony during her direct examination that, when she went into Robin O'Neal boutique *Page 1139 
on June 8, 1996, she was wearing a white T-shirt with a "Winston" cigarette logo on the front pocket. After Ballard reiterated in cross-examination that she was positive about what she was wearing the day she was arrested, the arresting officer was called in rebuttal and testified that Ballard was not wearing a white T-shirt with a "Winston" logo on the front pocket, but was wearing a white T-shirt with another design on the front. The prosecution then offered a "mug shot" of Ballard taken the day she was arrested, which showed the T-shirt Ballard was wearing. When Ballard again took the witness stand in surrebuttal to acknowledge that she had been mistaken about the T-shirt she had been wearing, the prosecutor engaged in vigorous cross-examination concerning Ballard's truthfulness and credibility. Ballard argues that to allow such cross-examination and impeachment on a collateral matter was reversible error.
 "The general rule is that a witness may not be impeached on a collateral matter. 3A Wigmore on Evidence § 1003
(Chadbourn rev. 1970); C. Gamble, McElroy's Alabama Evidence, § 156.01(1) (3rd ed. 1977)]. A fact is `collateral' if it is `admissible neither upon an issue under the pleadings of the case nor for the purpose of impeaching the witness' credibility in some means other than inconsistency.' McElroy's, § 156.01(3). Wigmore states the test as follows: `Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?' 3A Wigmore § 1003 (emphasis omitted)."
Brundage v. State, 585 So.2d 238, 240 (Ala.Cr.App. 1991).
"The Alabama Supreme Court has held:
 "`To affect the general credit of the witness the contradictory statements must relate to matter which is material to the issue on trial and not to those incidental or collateral facts which are remote in their application to the offense on trial and which would improperly extend the issues or involve the trial of other offenses which have no legitimate bearing on the particular offense under investigation.'
 "`But there is an exception to this rule, that if it has relation to the credibility of the witness in the particular case it is admissible, although it be in respect to collateral or immaterial matter.'
 "Noble v. State, 253 Ala. 519, 521-22, 45 So.2d 857, 859
(1950) (emphasis in the original)."
Ward v. State, 653 So.2d 1003, 1005 (Ala.Cr.App. 1994).
In this case, Ballard herself made the clothes she was wearing the day of the incident a relevant and material matter. Ballard testified:
 "I had on Vance's old sweatpants. They are gray and they had two blue stripes down the side. And a white T-shirt that had a pocket that had `Winston' written on the pocket, and a pair of sandals that were old and dirty."
(R. 972.) Ballard also testified that, because she was going to the hair salon, her hair was "big and frizzy" that morning. Ballard's husband corroborated her testimony as to what she was wearing. The materiality of what Ballard was wearing was stated by defense counsel in closing argument. He argued that this incident escalated into a shoplifting case because Karen Hill, instead of walking around the corner to the hair salon and trying to "clear up any mistake," accused Ballard of theft because "she didn't think [Ballard] looked like the normal customer who came in her fancy store." (R. 1372.)
Because Ballard made her clothes part of a material matter in the case, the trial court properly allowed the prosecutor to rebut Ballard's testimony concerning the white T-shirt. Ward v. State, supra. When Ballard then testified in surrebuttal to explain her earlier testimony, the trial court did not abuse its discretion in allowing the prosecutor leeway on cross-examination *Page 1140 
in vigorously questioning Ballard's truthfulness and credibility. Beavers v. State, 565 So.2d 688, 689-90 (Ala.Cr.App. 1990). There is no error here and no reason for declaring a mistrial.
 VI.
Ballard argues that the trial court erred in overruling objections to the prosecutor's cross-examination of character witnesses presented by the defense. Eight character witnesses for the defense testified that they believed Ballard to be honest and truthful, and that Ballard had a reputation for honesty and truthfulness among "those with whom [the witnesses] and she mutually associate." Each witness testified that he or she would personally believe Ballard's testimony under oath in a court of law. On cross-examination, the prosecutor asked the first character witness, "Are you telling us that you would believe the defendant's testimony in this courtroom under oath even if to do so you would have to disbelieve the testimony of four or five other witnesses who testified also under oath, including a police officer?" The witness answered, "Yes." (R. 1197.) Defense counsel objected to the question on the grounds that it was "improper form" and was "not based on any facts in evidence." The second witness was asked a similar question, over the same objection. When the witness answered affirmatively, the prosecutor asked, "In order to support your statement that you would believe her and continue to believe her testimony under oath even if it were different from four or five other witnesses who testified under oath, wouldn't it be important for your determination to see for yourself or test for yourself the believability of those other witnesses?" Defense counsel objected on grounds that the question was improper and that it was not based on facts in evidence. (R. 1209.) The witness ultimately responded that, if he were in the decision-making position, it would be important to him. (R. 1212.) The prosecutor asked the same type questions of the fourth witness over defense objections that the questions were irrelevant and improper. (R. 1225-29.) The fifth and sixth witnesses were also asked the same questions over defense objections that the questions were not based on facts in evidence and that they were improper. The seventh witness was asked, "You don't know whether or not the defendant's conduct was in keeping with what you believe to be her character for truthfulness and honesty or what you believe her reputation is with regard to those things, do you?" Defense counsel objected to the question as being improper. (R. 1251.) The eighth witness was asked the same question, without objection. (R. 1259-60.)
In her brief to this court, Ballard paraphrases these questions and argues that the questions were improper because, she says, they misinformed the witnesses about disbelieving the other state witnesses, they improperly pitted Ballard's credibility against that of the other witnesses (including the police officer), and they went to the ultimate issue in the case. She further argues that the questions were improper because a character witness is not called to evaluate the defendant's particular testimony, but merely to testify as to a general character trait of the defendant.[1]
 "A party is given wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge. Wells v. State, 292 Ala. 256, 292 So.2d 471 (1973); Housing Authority of City of Decatur v. *Page 1141 Decatur Land Co., 258 Ala. 607, 64 So.2d 594 (1953); Hooper v. State, 585 So.2d 142 (Ala.Cr.App. 1991), cert. denied, 503 U.S. 920, 112 S.Ct. 1295, 117 L.Ed.2d 517 (1992); C. Gamble, [McElroy's Alabama Evidence, § 136.01 (4th ed. 1991)]. The range of cross-examination rests largely in the discretion of the trial court, and that court's ruling will not be disturbed unless it clearly appears that the defendant was prejudiced by the ruling. Hooper v. State. However, `where the witness' testimony is important to the determination of the issues being tried, there is little, if any, discretion in the trial court to disallow cross-examination.' Wells v. State, 292 Ala. at 258, 292 So.2d at 473."
Williams v. State, 710 So.2d 1276, 1327-28 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929,118 S.Ct. 2325 (1998).
In this case, each character witness testified that he or she would believe Ballard if she testified under oath in a court of law. The trial court did not abuse its discretion in allowing the prosecutor to thoroughly sift that testimony to determine the extent and limitations, if any, of the character witnesses' convictions. The prosecutor did not exceed the broad scope of permissible cross-examination with her questioning as to what extent the character witnesses would believe Ballard's in-court testimony. DeBruce v. State,651 So.2d 599, 606 (Ala.Cr.App. 1993), aff'd, 651 So.2d 624 (Ala. 1994).
 VII.
Ballard argues that the trial court erred when it found that she had failed to make a prima facie showing of discrimination by the prosecutor's use of peremptory strikes and when it did not require the prosecutor to provide race-neutral and gender-neutral reasons for its strikes against white women. See Batson v. Kentucky, 476 U.S. 79 (1986), and J.E.B. v. Alabama, 511 U.S. 127
(1994). Ballard offered the following basis for her Batson motion:
 "Of the 27 persons who were on the jury venire, there were 15 females. The State used 6 of its 7 strikes to strike females.
 "Of the 27 persons, 9 were white females. And the State used 5 of its 7 strikes to strike . . . white females."
(R. 186.)
We have reviewed the voir dire examination contained in the record in light of the factors set out in Ex parte Branch,526 So.2d 609 (Ala. 1987). We do not find sufficient evidence that the female veniremembers who were struck shared only the characteristic of gender. Nor do we find sufficient evidence that the white female veniremembers who were struck shared only the characteristic of their race and gender. We find nothing in the type and manner of the prosecutor's statements or questions during the voir dire examination that indicated an intent to discriminate against female or white female veniremembers. The record does not disclose a lack of meaningful voir dire directed at the female or white female veniremembers. Nothing in the record indicates that female jurors and male jurors, or black jurors and white jurors, were treated differently by the prosecution. There is no evidence that the prosecutor had a history of misusing peremptory challenges so as to discriminate against females or, in particular, white females. We find only that the prosecutor used many of her strikes to remove women from the venire, and that many of those women were also white. "Without more, we do not find that the number of strikes this prosecutor used to remove women [or white women] from the venire is sufficient to establish a prima facie case of gender [or racial] discrimination." Ex parte Trawick, 698 So.2d 162, 168
(Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568 (1997); Ex parte Branch, 503 So.2d at 622-23; Ex parte Thomas, 659 So.2d 3
(Ala. 1994). *Page 1142 
 VIII.
Ballard argues that the cumulative effect of the prosecutor's alleged repeated misconduct in her case deprived her of a fair trial. In support of her argument, Ballard restates the issues discussed above, and then briefly lists the following additional allegations of prosecutorial misconduct: 1) that the prosecutor improperly cross-examined Ballard's husband on whether special arrangements had been made to have Ballard released from custody after her arrest and then questioned the arresting officer on the same matter; 2) that, during a defense objection to a question she was asking Ballard on cross-examination, the prosecutor stated in front of the jury that she believed the defense was "opening the door to a matter that I don't think he wants to get into"; 3) that the prosecutor's question of Ballard on cross-examination, "Is that the truth or is the truth, just like your handwriting on this questioned invoice, just somewhere within your range of variation?" improperly insinuated facts not in evidence; and 4) that the prosecutor improperly asked Ballard whether she had ever stated that she had conducted a study of shoplifting in her official capacity as State Personnel Director.
As to the additional allegations of prosecutorial misconduct Ballard lists as evidence of cumulative error, Ballard chose not to completely brief those allegations as reversible error. We, therefore, choose not to address individually those allegations of prosecutorial misconduct not fully briefed, but will consider them as they were argued, in the context of cumulative error. See Burk v. State, 600 So.2d 374 (Ala.Cr.App. 1991) ("allegations . . . not expressly argued on . . . appeal . . . are deemed by us to be abandoned"), quoting United States v. Burroughs, 650 F.2d 595, 598
(5th Cir.), cert. denied, 454 U.S. 1037, 102 S.Ct. 580,70 L.Ed.2d 483 (1981).
There is no merit to the assertion of cumulative error.
 "`[B]ecause no single instance of alleged improper conduct constituted reversible error, this Court will not consider the cumulative effect to be greater error. McNeely v. State, 524 So.2d 375 (Ala.Cr.App. 1986); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App. 1989).' Crymes v. State, 630 So.2d 120, 123-24 (Ala.Cr.App. 1993), aff'd, 630 So.2d 125 (Ala. 1993)."
Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App. 1997), aff'd,715 So.2d 852 (Ala. 1998).
Ballard is not entitled to any relief as to this claim of cumulative error.
Ballard received a fair trial. Therefore, the judgment of the circuit court is due to be, and is hereby, affirmed.
AFFIRMED.
Long, P.J., and McMillan, Baschab, and Fry, JJ., concur.
[1] Ballard objects to several other questions posed by the prosecutor to some of these character witnesses. However, a review of the record reveals that the trial judge sustained defense counsel's objections to these questions. Therefore, there are no adverse rulings on which to base appellate review. Maul v. State,531 So.2d 35, 36 (Ala.Cr.App. 1987).